Joan Caldwell JOHNSON; Lorraine Witherspoon Baker; Danny Kay Smith; Sara Edell Boan; Deanna Kay Frans; Darryl Bernard Epps; Andrew

Nobles; Joseph Chester Walker; William Joseph Harnett, Jr.; Bruce Anderson; William Bell; Faye Blaylock; Mike Brewer; Mike Brown; Ronald Callahan; Sandra Coulter; Lisa Crum; Andreas Drutis; Crystal Gayle Edwards; Buster Elfin Floyd; George Henley; Loretta Jones; Margaret Locklear; Tammy Locklear; Linda McCleod; William McCormick; Hugh Meise; Patty Miller; Gary Padgett; Mary Pinchback; Vardry Pittman; Albert J. Samra; Mason Skeenes; Jim Stolz; Amber Strickland; Charles Stubbs; Lonya Thigpen; James Thompson; Jessie Williams; Valerie Williams, and on behalf of themselves and all others similarly situated; State of South Carolina; ex rel., Charles M. Condon, in his official capacity as Attorney General, Plaintiffs–Appellees,

v.

COLLINS ENTERTAINMENT COMPANY, INCORPORATED; American Amusement Company, Incorporated; American Amusement of Aiken, Incorporated; Joytime Distributors & Amusement, Incorporated; Red Dot Amusements; CBA Games, Incorporated; Best Amusement Company; Greenwood Music Company, Incorporated; Ace Amusement, LLC; B & J Amusement; Broyles & Lutz, Incorporated; Carousel Amusements; Coley, Incorporated; Drew Industries; Fast Freddies; Great Games, Incorporated; H & J of South Carolina, Incorporated; Holliday Amusement Company of Charleston, Incorporated; Hoyts Music Company, Incorporated; Huckleberry Amusement, Incorporated; Ingram Investments; J.M. Brown Amusement Company, Incorporated; Larry Wolfe Amusement; MHJ Corporation; MHS Enterprises, Incorporated; Martin Coin Machine, Incorporated; McDonald Amusement Company; Midlands Gaming Corporation; Orangeburg Amusement, Incorporated; Pedroland, Incorporated; R.L. Jordan Oil Company of North Carolina; Rosemary Coin Machines of Florence, Incorporated; Scott's Vending Incorporated of Columbia; Sumter Petroleum Company; Tim's Amusement, Incorporated; Videomatic Amusements, Incorporated; H. Hugh Andrews, II; Pamela A. Andrews; Dwayne I. Bohannon; J.M. Brown; Don E. Broyles; Grace E. Coley; Fred Collins; J. Samuel Cox; Kenneth G. Flowe; Carey Hardee; Scott G. Hogue; Lowell E. Holden; Patricia Holliday; Warren P. Holliday; Henry E. Ingram; Steven E. Lipscomb; Tim Mahon; Jimmy Martin, Jr.; Cynthia McDonald; James McDonald; Allan Schaefer; David R. Simpson; Ron Spencer; Mickey H. Stacks; William Darwin Wheeler; Hershel L. Williamson; A.J. Wilson, Jr., in their individual and corporate capacities as representatives of all others similarly situated, Defendants–Appellants.

Joan Caldwell Johnson; Lorraine Witherspoon Baker; Danny Kay Smith; Sara Edell Boan; Deanna Kay Frans; Darryl Bernard Epps; Andrew Nobles; Joseph Chester Walker; William Joseph Harnett, Jr.; Bruce Anderson; William Bell; Faye Blaylock; Mike Brewer; Mike Brown; Ronald Callahan; Sandra Coulter; Lisa Crum; Andreas Drutis; Crystal Gayle Edwards; Buster Elfin Floyd; George Henley; Loretta Jones; Margaret Locklear; Tammy Locklear; Linda McCleod; William McCormick; Hugh Meise; Patty Miller; Gary Padgett; Mary Pinchback; Vardry Pittman; Albert J. Samra; Mason Skeenes; Jim Stolz; Amber Strickland; Charles Stubbs; Lonya Thigpen; James Thompson; Jessie Williams; Valerie Williams, and on behalf of themselves and all others similarly situated; State of South Carolina; ex rel., Charles M. Condon, in his official capacity as Attorney General, Plaintiffs–Appellees,

State of South Carolina; ex rel., Charles M. Condon, in his official capacity as Attorney General, Plaintiffs,

v.

Collins Entertainment Corporation; Fred Collins, Defendants–Appellants,

American Amusement Company, Incorporated; American Amusement of Aiken, Incorporated; Joytime Distributors & Amusement, Incorporated; Red Dot Amusements; CBA Games, Incorporated; Best Amusement Company; Greenwood Music Company, Incorporated; Ace Amusement, LLC; B & J Amusement; Broyles & Lutz, Incorporated; Carousel Amusements; Coley, Incorporated; Drew Industries; Fast Freddies; Great Games, Incorporated; H & J of South Carolina, Incorporated; Holliday Amusement Company of Charleston, Incorporated; Hoyts Music Company, Incorporated; Huckleberry Amusement, Incorporated; Ingram Investments; J.M. Brown Amusement Company, Incorporated; Larry Wolfe Amusement; MHJ Corporation; MHS Enterprises, Incorporated; Martin Coin Machine, Incorporated; McDonald Amusement Company; Midlands Gaming Corporation; Orangeburg Amusement, Incorporated; Pedroland, Incorporated; R.L. Jordan Oil Company of North Carolina; Rosemary Coin Machines of Florence, Incorporated; Scott's Vending Incorporated of Columbia; Sumter Petroleum Company; Tim's Amusement, Incorporated; Videomatic Amusements, Incorporated; H. Hugh Andrews, II; Pamela A. Andrews; Dwayne I. Bohannon; J.M. Brown; Don E. Broyles; Grace E. Coley; Fred Collins; J. Samuel Cox; Kenneth G. Flowe; Carey Hardee; Scott G. Hogue; Lowell E. Holden; Patricia Holliday; Warren P. Holliday; Henry E. Ingram; Steven E. Lipscomb; Tim Mahon; Jimmy Martin, Jr.; Cynthia McDonald; James McDonald; Allan Schaefer; David R. Simpson; Ron Spencer; Mickey H. Stacks; William Darwin Wheeler; Hershel L. Williamson; A.J. Wilson, Jr., in their individual and corporate capacities as representatives of all others similarly situated, Defendants,

South Carolina Department of Revenue, Movant.

Joan Caldwell Johnson; Lorraine Witherspoon Baker; Danny Kay Smith; Sara Edell Boan; Deanna Kay Frans; Darryl Bernard Epps; Andrew Nobles; Joseph Chester Walker; William Joseph Harnett, Jr.; Bruce Anderson; William Bell; Faye Blaylock; Mike Brewer; Mike Brown; Ronald Callahan; Sandra Coulter; Lisa Crum; Andreas Drutis; Buster Elfin Floyd; George Henley; Loretta Jones; Margaret Locklear; Tammy Locklear; Linda McCleod; William McCormick; Hugh Meise; Patty Miller; Gary Padgett; Mary Pinchback; Vardry Pittman; Albert J. Samra; Mason Skeenes; Amber Strickland; Charles Stubbs; Lonya Thigpen; James Thompson; Jessie Williams; Valerie Williams, and on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

Crystal Gayle Edwards; Jim Stolz; State of South Carolina; ex rel., Charles M. Condon, in his official capacity as Attorney General, Plaintiffs,

v.

Pedroland, Incorporated; Ingram Investments, Incorporated; MHS Enterprises, Incorporated; R.L. Jordan Oil Company of North Carolina, Incorpo-

rated; Henry E. Ingram and Mickey H. Stacks, Defendants–Appellants,

and

Collins Entertainment Corporation; American Amusement Company, Incorporated; American Amusement of Aiken, Incorporated; Joytime Distributors & Amusement, Incorporated; Red Dot Amusements; CBA Games, Incorporated; Best Amusement Company; Greenwood Music Company, Incorporated; Ace Amusement, LLC; B & J Amusement; Broyles & Lutz, Incorporated; Carousel Amusements; Coley, Incorporated; Drew Industries; Fast Freddies; Great Games, Incorporated; H & J of South Carolina, Incorporated; Holliday Amusement Company of Charleston, Incorporated; Hoyts Music Company, Incorporated; Huckleberry Amusement, Incorporated; J.M. Brown Amusement Company, Incorporated; Larry Wolfe Amusement; MHJ Corporation; Martin Coin Machine, Incorporated; McDonald Amusement Company; Midlands Gaming Corporation; Orangeburg Amusement, Incorporated; Rosemary Coin Machines of Florence, Incorporated; Scott's Vending Incorporated of Columbia; Sumter Petroleum Company; Tim's Amusement, Incorporated; Videomatic Amusements, Incorporated; H. Hugh Andrews, II; Pamela A. Andrews; Dwayne I. Bohannon; J.M. Brown; Don E. Broyles; Grace E. Coley; Fred Collins; J. Samuel Cox; Kenneth G. Flowe; Carey Hardee; Scott G. Hogue; Lowell E. Holden; Patricia Holliday; Warren E. Holliday; Steven E. Lipscomb; Tim Mahon; Jimmy Martin, Jr.; Cynthia McDonald; James McDonald; Allan Schaefer; David R. Simpson; Ron Spencer; William Darwin Wheeler; Herschel L. Williamson; A.J. Wilson, Jr., in their individual and corporate capac-

ities and in their capacities as representatives of all others similarly situated, Defendants,

and

South Carolina Department of Revenue, Movant.

Nos. 98–2225, 99–1601, 99–1709.

United States Court of Appeals, Fourth Circuit.

Argued: Sept. 22, 1999.

Decided: Dec. 27, 1999.

L.L.P., Columbia, South Carolina, for Appellants. William Allen Nickles, III, Gergel, Nickles & Solomon, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF**: A. Camden Lewis, Lewis, Babcock & Hawkins, L.L.P., Columbia, South Carolina, for Appellants Ace Amusement, et al.; Richard A. Harpootlian, Columbia, South Carolina, for Appellants Coley, et al.; David E. Belding, Columbia, South Carolina, for Appellants MHS Enterprises and Stacks; J. Brent Kiker, Kiker & Douds, Beaufort, South Carolina, for Appellants Ingram Investments and Ingram; Matthew A. Henderson, Henderson, Brandt & Vieth, Spartanburg, South Carolina, for Appellant Jordan Oil; J. Boone Aiken, III, Aiken, Nunn, Elliott & Tyler, Florence, South Carolina; James B. Richardson, Jr., Richardson & Birdsong, Columbia, South Carolina, for Appellant Pedroland; O.W. Bannister, James W. Bannister, Hill, Wyatt & Bannister, Greenville, South Carolina; Russell D. Ghent, Leatherwood, Walker, Todd & Mann, Greenville, South Carolina, for Appellants Collins Amusement and Collins. Richard M. Gergel, Carl L. Solomon, David E. Rothstein, Gergel, Nickles & Solomon, P.A., Columbia, South Carolina; Lawrence E. Richter, Jr., Saul Gliserman, David K. Haller, The Richter Firm, P.A., Mount Pleasant, South Carolina; R. Randall Bridwell, Columbia, South Carolina; Richard K. Walker, Streich Lang, Phoenix, Arizona; J.P. Strom, Jr., Thomas R. Young, Jr., Strom, Young & Thurmond, L.L.P., Columbia, South Carolina, for Appellees.

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge, and Frank J. MAGILL, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

**ARGUED**: Dwight Franklin Drake, Nelson, Mullins, Riley & Scarborough,

Vacated and remanded with directions by published opinion. Chief Judge WILKINSON wrote the opinion, in which

Senior Judge MAGILL joined. Judge LUTTIG wrote an opinion concurring in the judgment.

## OPINION

WILKINSON, Chief Judge:

Plaintiffs are habitual gamblers who have sued South Carolina video poker operators as part of an effort to kick their habits. They requested an injunction to prevent the video poker operators from paying out more than $125 daily to a customer at one location. Plaintiffs also sought damages based on alleged violations of the payout limit and other statutes. The district court granted the injunction based on its interpretation of state law and ruled in plaintiffs' favor on a question of state unfair competition law. In doing so, however, the district court improperly interfered with a state regulatory scheme whose design is at the heart of the state's police power. The district court should instead have abstained under the doctrine of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). We therefore vacate the injunction and remand this case with directions to dismiss or remand to state court all claims for equitable relief and to stay proceedings on claims for damages pending the resolution by the state courts of disputed questions of state law. We do so in the belief that the resolution of the volatile questions surrounding video poker must be committed above all to the legislative, judicial, and regulatory processes of South Carolina.

### I.

Video poker has arguably been the most hotly contested issue in South Carolina in recent years. For nearly two centuries, South Carolina law prohibited gambling. This ban did not extend, however, to "coin operated nonpayout machines with a free play feature" so long as the machines did not disburse "money or property" to a player. S.C.Code Ann. § 16–19–60 (Law. Co-op.1976). A 1986 amendment to this provision simply deleted the words "or property." *See* Act effective June 18, 1986, Part II, § 26B, 1986 S.C. Acts 540.

In 1991, the South Carolina Supreme Court interpreted the amended provision as authorizing cash payouts to players of video gaming machines so long as the money was dispensed by a person and not by a machine. *See State v. Blackmon*, 304 S.C. 270, 403 S.E.2d 660 (1991). The ruling encouraged the exponential growth of the video poker industry and the intense debates that have accompanied it. As of March 1999, there were nearly 34,000 reported video poker machines in the state. *See* South Carolina Dep't of Revenue, *South Carolina Video Game Machine Quarterly Reports, 1st Quarter 1999* (1999). Over $2.5 billion was deposited into these machines in 1998. *See* South Carolina Dep't of Revenue, *South Carolina Video Game Machine Quarterly Reports, 4th Quarter 1998* (1999).

South Carolina has employed a variety of legislative, administrative, and judicial mechanisms to regulate this multi-billion dollar business. These mechanisms constitute an interdependent state network aimed at the comprehensive regulation of video poker.

The South Carolina General Assembly has been engaged in extensive efforts to regulate the video poker industry. For example, in 1993 the legislature enacted the Video Game Machines Act (VGMA), S.C.Code Ann. §§ 12–21–2770 et seq. (West Supp.1998), to impose licensing requirements and a wide range of other restrictions on the industry. The statute requires detailed quarterly reports on the location, use, and profitability of each video poker machine. *See* S.C.Code Ann. § 12–21–2776(B). The statute also limits the number of machines at a single place or premises to five, *see* S.C.Code Ann. § 12–21–2804(A), and forbids businesses that provide cash payouts for video poker from operating within three hundred feet of municipal schools, playgrounds, and places of worship, *see* S.C.Code Ann. § 12–21–2793.

Other provisions deal with everything from the mechanical requirements of machines, *see* S.C.Code Ann. § 12–21–2774, to the permissible hours of machine operation, *see* S.C.Code Ann. § 12–21–2804(E). The statute also prescribes various remedies for violations of its terms. *See, e.g.,* S.C.Code Ann. § 12–21–2788 (revocation or denial of license for illegal placement of machines); S.C.Code Ann. § 12–21–2794 (criminal sanctions for tampering with machines); S.C.Code Ann. § 12–21–2804(F) (civil and criminal sanctions for various types of violations). The General Assembly has revisited the problems of video poker regulation frequently since 1993, balancing the revenue gained from licensing and taxation of video poker against the social costs of gambling addiction.

State administrative agencies have also been involved with the regulation of video poker. The South Carolina Department of Revenue (DOR) and State Law Enforcement Division (SLED) share responsibility for enforcement of the state's gaming laws. *See* S.C.Code Ann. §§ 12–21–10, 23–3–15 (Law. Co-op.1976 & West Supp.1998); *see also* Exec. Order No. 96–13 (1996). The DOR and SLED have enforced these laws, *inter alia,* by conducting on-premise inspections and levying fines against video poker operators for infractions.

The General Assembly has also vested the Department of Revenue with the authority to promulgate regulations governing video poker machines and operators. *See* S.C.Code Ann. § 12–21–2798. The DOR has issued dozens of regulations, rulings, and letters designed to notify video poker operators of the steps necessary to comply with the law. The requirements cover topics ranging from the meaning of "single place or premises," *see* 27 S.C.Code Ann. Regs. 117–190 (West Supp.1997), to the minutiae of the licensing process, *see, e.g.,* Info. Ltr. 94–11 (April 26, 1994), to the VGMA's application to multi-player video gaming devices, *see* Rev. Rul. 95–10 (June 28, 1995).

The Attorney General of South Carolina likewise issues opinions on a wide range of video poker matters. *See, e.g.,* 1997 WL 323785 (S.C. Att'y Gen. May 23, 1997) (local law enforcement of VGMA); 1995 WL 805829 (S.C. Att'y Gen. Oct. 17, 1995) (municipal tax on video poker). And as the state's chief law enforcement officer, the Attorney General advises the governor on how to tackle problems of enforcement.

In 1993, the legislature created the Administrative Law Judge (ALJ) Division, which deals in part with the issues arising from regulation of the video poker industry. *See* S.C.Code Ann. § 1–23 500 et seq. (West Supp.1998). Most importantly, the ALJ Division has appellate jurisdiction over DOR license denials and revocations. *See* S.C.Code Ann. § 12–60–1320 (West Supp.1998). The ALJ Division hears scores of cases each year involving the interpretation and enforcement of gaming laws. *See, e.g., South Carolina Dep't of Revenue v. B & C Enterprises,* No. 99–ALJ–17–0297–CC, 1999 WL 787789 (S.C.A.L.J.Div. September 9, 1999) (addressing meaning of "single place or premises"); *South Carolina Dep't of Revenue v. Branch,* No. 99–ALJ–17–0138–CC, 1999 WL 675071 (S.C.A.L.J.Div. August 9, 1999) (penalties for failure to procure license from DOR). In the course of these adjudications, the ALJ Division has presumably developed substantial expertise in the peculiar problems of interpretation and enforcement that characterize video poker regulation.

Finally, the state judiciary has also been an active partner with the legislative and executive branches in forging the landscape of video poker regulation. The state courts are intimately involved in this scheme through the adjudication of private actions and the review of administrative decisions. These cases have dealt with issues touching not only technical state regulatory concerns, *see, e.g., South Carolina Dep't of Revenue v. Rosemary Coin Machs., Inc.,* 331 S.C. 234, 500 S.E.2d 176 (1998) (licensing requirements for a multi-

player black-jack machine), but also basic questions of the allocation of democratic power in South Carolina, *see, e.g., Martin v. Condon,* 324 S.C. 183, 478 S.E.2d 272 (1996) (legality of county-by-county referendum on video poker).[1]

## II.

The procedural history of this case also underscores its state law nature. Plaintiffs Joan Johnson, et al., claim to be habitual gamblers who have lost money on video poker. Defendants Collins Entertainment Co., et al., comprise a substantial segment of the video poker industry in South Carolina. Plaintiffs filed suit against defendants in state court alleging numerous statutory and common law violations and seeking both injunctive relief and damages.

Plaintiffs claimed that they became addicted to video poker because defendants were offering cash payouts in excess of the maximum amount allowed under South Carolina law. The parties offered competing interpretations of the $125 per customer per day per location limit imposed by S.C.Code Ann. § 12–21–2791. Plaintiffs contended that the statute imposes an absolute $125 cap on payouts. Defendants argued that it merely prohibits them from paying out more than $125 above the amount deposited by a player into the machines. Defendants also offered the interpretation that this provision authorizes successive daily payouts of up to $125 for winnings accumulated in one day.

Plaintiffs further claimed that the offering of illegal cash prizes constituted both a "special inducement" to play video poker in violation of S.C.Code Ann. § 12–21–2804(B) and an unfair trade practice in

violation of the South Carolina Unfair Trade Practices Act (SCUTPA), S.C.Code Ann. §§ 39–5–10 et seq. (Law.Co-op.1976). Plaintiffs also asserted federal claims under the Racketeer Influenced Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961–1968 (1994 & Supp. III 1997), based on the alleged underlying state law violations. Defendants have contested all of these claims.

Plaintiffs also raised a number of other claims not directly involved in this appeal but which accentuate the intensely state character of this litigation. For example, plaintiffs sought a declaration that video poker violated the state constitution's prohibition of lotteries. This question was ultimately certified to the Supreme Court of South Carolina, which ruled that video poker was not unconstitutional. *See Johnson v. Collins Entertainment Co.,* 333 S.C. 96, 508 S.E.2d 575 (1998). Plaintiffs also contended that a state "beer and wine" statute outlawed video poker on premises that served alcohol. This issue has also been the subject of separate state proceedings. Other state law claims asserted by plaintiffs include fraud, negligent misrepresentation, civil conspiracy, conversion, constructive trust, unjust enrichment, and a statutory right to recover gambling losses.

Defendants removed this case to federal court on the basis of the federal RICO claims. In December 1997, plaintiffs moved for a preliminary injunction to prevent defendants from exceeding the $125 daily payout limit. In response, defendants moved to enjoin plaintiffs from entering their premises. The district court denied defendants' request for an injunction in July 1998 and later denied defen-

---

1. In fact, recent developments in South Carolina demonstrate that the state legislature and state judiciary have been addressing issues surrounding the video poker industry. In July 1999, the General Assembly enacted legislation outlawing cash payouts from video poker as of July 1, 2000. *See* Act of July, 1, 1999, 1999 S.C. Acts 125. The South Carolina Supreme Court recently upheld this law

while disallowing a referendum that would have given voters an opportunity to keep video poker legal. *See Joytime Distrib. & Amusement Co. v. South Carolina,* No. 25007, 1999 WL 969280 (S.C. Oct.14, 1999). Inasmuch as the state supreme court's decision left standing a law that absent revision will not go into effect until next summer, the instant case remains a live controversy.

dants' motion for abstention. Defendants filed this interlocutory appeal, challenging the denial of their motion for an injunction. They also asserted that the district court should abstain from exercising its jurisdiction in this case on the grounds that the case involved difficult questions of state law and that federal judicial involvement would constitute an unwarranted interference with a state regulatory program.

In the meantime, the Attorney General of South Carolina, who had intervened in this action, withdrew from the case except as to the question of whether video poker violates the state constitution's lottery ban. In doing so, he indicated that it was his practice to defer to the DOR on "primarily regulatory" questions of statutory interpretation, including the meaning of the $125 payout limit. The Attorney General further noted that the payout limit statute was ambiguous and susceptible to at least three different interpretations.

Plaintiffs eventually abandoned their pursuit of a preliminary injunction. In February 1999, they instead requested a permanent injunction enforcing an absolute $125 payout limit against eight defendants. Plaintiffs also moved for partial summary judgment on the interpretation of the payout limit and the questions of whether defendants' offering of illegal jackpots constituted special inducements, unfair trade practices, and RICO violations.

In April 1999, the district court entered partial summary judgment for plaintiffs on the interpretation of the $125 payout limit and found that defendants' activities constituted unfair trade practices as a matter of South Carolina law. The district court rendered no decision on the special inducement issue and plaintiffs' RICO claims,

instead keeping these matters under advisement.

The district court, citing its "inherent equitable power," also granted the permanent injunction sought by plaintiffs. In doing so, the district court did not claim that any statute expressly authorized it to grant such relief.

As part of its injunctive order, the district court imposed on defendants an extensive set of requirements as an "enforcement mechanism." For example, the district court mandated that defendants post a designated "clarifying sign" on each video poker machine. The district court also required defendants to maintain detailed, signed logs containing personal information about each recipient of a video poker payout. The district court imposed numerous other requirements on the eight targeted defendants as well.

Defendants appealed these rulings on the grounds that the district court lacked the authority to issue the injunction, abused its discretion in enjoining defendants, and erred in finding unfair trade practices as a matter of law. Defendants again claimed that the district court should have abstained from entertaining the merits of the action. All appeals were consolidated.

Defendants also petitioned this court for a stay of the district court's injunction. We granted the stay because of the serious federalism concerns raised by this case. We now address the issues raised on appeal.[2]

## III.

At the heart of the parties' contentions in this case is the doctrine of abstention. Although that doctrine has many different

---

**2.** We also deny plaintiffs' motion to "withdraw" the injunction. Coming on the eve of oral argument, and on the heels of plaintiffs' own petition to the court en banc to lift the stay of the injunction, the motion played essentially a game of "cat and mouse" with the court. Defendants are correct to note that a judgment of the district court can be affirmed

or nullified through reversal or vacation, whereas a "withdrawal" would leave undisturbed the underlying orders and judgment. If the injunction were withdrawn and then needed again in plaintiffs' view, plaintiffs presumably could move the district court to reinstate the injunction, in the absence of an appellate ruling.

forks and prongs, its central idea has always been one of simple comity. *See, e.g., Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Notwithstanding the overlapping obligations of state and federal courts with regard to both state and federal law, the federal judiciary has always maintained some modicum of respect for state public policies in areas of paramount state concern.

■ Federal courts should thus "exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford,* 319 U.S. at 318, 63 S.Ct. 1098 (internal quotation marks omitted). And the federal judiciary should accordingly abstain from deciding cases (1) that present "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" or (2) whose adjudication in a federal forum "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (*NOPSI*) (internal quotation marks omitted).

■ The Supreme Court has admonished the federal courts to respect the efforts of state governments to ensure uniform treatment of essentially local problems. *See Quackenbush,* 517 U.S. at 728, 116 S.Ct. 1712. Principles of federalism and comity require no less. *See id.* Basic abstention doctrine requires federal courts to avoid interference with a state's administration of its own affairs. *See Meredith v. Talbot County,* 828 F.2d 228, 231 (4th Cir.1987). Though "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), its importance in our system of dual sovereignty cannot be underestimated. It safeguards our federal system from the "[d]elay, misunderstanding of local law, and needless conflict with [a] state policy" that inevitably result from federal judicial intrusions into areas of core state prerogative. *Burford,* 319 U.S. at 327, 63 S.Ct. 1098.

■ Plaintiffs contend that abstention is improper in this case.[3] They argue that the district court's actions pose no risk of federal-state friction and do not interfere with state regulation of the video poker industry. Plaintiffs claim that the district court instead properly entertained the merits of this action.

■ We disagree. The exercise of federal equitable discretion in this case supplanted the legislative, administrative, and judicial processes of South Carolina and sought to arbitrate matters of state law

---

**3.** Plaintiffs also contend that the abstention issue is not properly before this court because the district court's refusal to abstain is not immediately appealable. *See Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1998). The *Gulfstream* Court held that an order denying a motion to stay or dismiss proceedings under *Colorado River,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483, is not immediately appealable. 485 U.S. at 278, 108 S.Ct. 1133. The only decision challenged on appeal in *Gulfstream* was the denial of the *Colorado River* motion. It is unclear that *Gulfstream* applies to a denial of *Burford* abstention, as the Court emphasized the "inherently tentative" nature of an order denying a *Colorado*

*River* motion as support for its holding. *Id.* A denial of *Burford* abstention is, in contrast, a decision that a district court is not likely to revisit based on changed circumstances.

Assuming, however, that *Gulfstream* would apply to *Burford* abstention claims, *Gulfstream* precludes appellate review of a refusal to abstain only where no other issue supports appellate jurisdiction. This case, in contrast, began as an appeal of the district court's denial of defendants' motion for an injunction and now also encompasses defendants' appeal of the district court's injunctive order enforcing the $125 payout limit. These issues are properly before us under 28 U.S.C. § 1292(a)(1) (1994). The abstention issue is therefore properly before us also.

and regulatory policy that are best left to resolution by state bodies.

## A.

It is important to note at the outset that the district court ventured into an area where state authority has long been pre-eminent. The regulation of gambling enterprises lies at the heart of the state's police power. *See Casino Ventures v. Stewart,* 183 F.3d 307, 310 (4th Cir.1999). Formulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens. *See, e.g., Chicago & Alton R.R. Co. v. Tranbarger,* 238 U.S. 67, 77, 35 S.Ct. 678, 59 L.Ed. 1204 (1915). The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens. *See Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (state regulation of gambling is justified by substantial government interest in citizens' quality of life, including health, safety, and welfare). The question of how best to regulate gambling activity is also one to which different states can arrive at different answers based on their different experiences. *See id.*

State gaming policies reflect a delicate trade-off between the economic boon of increased tax revenue and enhanced employment on the one hand and the risk of moral rot, human exploitation, and political corruption on the other. Put another way, the question is whether the maximization of individual freedom and choice works a wholesale diminution in general social well-being. Each side of this scale embodies the classic subject matter of state prerogative. *See id.*

In fact, the parties' claims in this case illustrate the high stakes of even the most finely calibrated gaming policy decisions. Plaintiffs on the one hand argue that the conduct of video poker operators warrants strong sanctions for causing the economic and emotional ruin of the lives of many South Carolinians. Defendants on the other hand argue that unfavorable interpretations of state statutes may destroy their businesses and put hundreds of other South Carolinians out of work. The search for proper balance in this police power function is a task presumptively committed to the democratically accountable institutions of a state.

## B.

Given that state policy concerns are paramount, the district court contravened *Burford* principles by attempting to answer disputed questions of state gaming law that so powerfully impact the welfare of South Carolina citizens. *See NOPSI,* 491 U.S. at 361, 109 S.Ct. 2506. Issues of state law and state public policy have dominated this action from day one. Most notably, the parties have contested the meaning of the $125 payout limit in S.C.Code Ann. § 12–21–2791. When the district court interpreted this provision, it was necessarily trying to predict how the South Carolina Supreme Court would decide the question. *See, e.g., Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 29, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (federal court interpretation of state law is merely a guess as to definitive resolution by state courts). But because this question involved a most basic problem of South Carolina public policy, the state court system should have been permitted the first opportunity to resolve it. *See Burford,* 319 U.S. at 332, 63 S.Ct. 1098.

Respect was also due state courts on the question of whether defendants' offering of cash payouts above $125 constituted state unfair trade practices. *See* S.C.Code Ann. § 39–5–20. State unfair competition law is a tool that states use in an attempt to regulate vast spheres of activity with which the state police power has historically been concerned. The SCUTPA, like many similar state statutes, prohibits commercial conduct defined as "unfair" or

"deceptive." *Id.* These terms have a potentially broad sweep, and the meaning accorded to them will chart the course of state public policy. The district court erred then in manning the rudder of this aspect of state gaming policy when it decided for itself that violations of the payout limit were unfair trade practices as a matter of law.

The fact that the South Carolina Supreme Court has now addressed some of the very state law issues in this case underscores the propriety of abstention in the first place. The state supreme court rendered its interpretation of the $125 payout limit in *Gentry v. Yonce,* 522 S.E.2d 137 (S.C. 1999), several months after the district court had issued its injunction. This issue was thus resolved in precisely that forum which our federal system recognizes as the proper home for such questions of significant state policy. *Gentry* also addressed the unfair competition question but declined to go so far as the district court, holding only that advertising an illegal jackpot *could* be an unfair trade practice. *Id.* at 142–43. Navigating such issues without definitive state court guidance brings federal courts into the treacherous waters of state political controversy. Even if the federal and state court systems happen to arrive at the same ultimate resolution on an issue of important state public policy, there is real value to allowing the states the first crack at deciding issues so pertinent to their own self-governance.[4]

Our conclusion that the district court should have refrained from deciding the state law issues in this case is not altered by plaintiffs' assertion of federal RICO claims. In *Pomponio v. Fauquier County Bd. of Supervisors,* 21 F.3d 1319 (4th Cir. 1994) (en banc), we held that abstention was appropriate where federal constitutional claims asserted by a real estate developer against a county boiled down to questions of state land use law. The developer had alleged that the misconduct of county officials in rejecting his subdivision plan constituted violations of federal due process and equal protection guarantees. *See id.* at 1320. But the dispute was essentially about "[w]hether the zoning ordinance was incorrectly construed." *Id.* at 1322. We thus observed that "[t]he federal claims [were] really state law claims" because local zoning laws and decisions were the bases of the federal claims. *Id.* at 1326.

Many of our decisions applying abstention rest on this same "state law in federal law clothing" rationale. *See, e.g., Browning–Ferris v. Baltimore County,* 774 F.2d 77 (4th Cir.1985) (*Burford* abstention appropriate where federal claims under 42 U.S.C. § 1983 involved questions of local land use policy); *Caleb Stowe Assocs. v. County of Albemarle,* 724 F.2d 1079 (4th Cir.1984) (abstention appropriate where federal § 1983 claims depended on construction of state land use law). We noted in *Pomponio* that "these cases, when stripped of the cloak of their federal constitutional claims, are state law cases." 21 F.3d at 1326. The necessity of abstention as a prophylactic for state prerogative in such cases is clear. If it were unavailable, then the federal courts might adjudicate all kinds of disputes involving the most sensitive questions of state law and policy that arrive at their door under the guise of federal claims. Federal statutes such as RICO that incorporate state law violations as bases for federal relief would become Trojan horses.[5] Issues of purely state

---

4. The district court commendably stayed its hand on another issue of public import eventually addressed by *Gentry.* Specifically, it did not rule on whether the advertisement of illegal payouts may constitute a special inducement under S.C.Code Ann. § 12–21–2804(B) and thus qualify as a predicate act under RICO. The court would have been better advised, of course, to remain silent on this issue altogether rather than offering its "tentative position" as "dicta" and hinting that it might make its position final before *Gentry.* Restraint on all of these disputed state law questions was a preferable course to picking and choosing which unsettled issues to decide and which to defer.

5. Our concurring colleague misconstrues our purpose in making this point. We do not

public policy would have safe passage into the federal courthouse and burst forth inside its walls. This would in time endanger the independence of state policy at the core of state police power and cause friction between the federal and state systems.

The mere presence of a federal question thus cannot mask the quintessentially state character of this controversy. Plaintiffs' claims depend ultimately on alleged violations of state law for their predicate acts. An examination of their complaint reveals the state law essence of the RICO litigation. Plaintiffs assert that defendants deployed video poker machines that "violate the Constitution, laws and public policies of the State of South Carolina." The complaint then lists a number of state statutes that defendants allegedly violated, including the payout limit and the prohibition of special inducements. Plaintiffs go on to accuse defendants of various infringements of federal law constituting "racketeering activity."

The existence of each of these federal law violations, however, turns on underlying questions of state law. For instance, plaintiffs allege that defendants have assisted in the placement of wagers that constitute "unlawful debts" within the meaning of 18 U.S.C. § 1961(6) and in violation of 18 U.S.C. § 1084. Yet as plaintiffs admit, whether these wagers constitute "unlawful debts" depends first on whether the wagers themselves are "unlawful in various respects under the laws of South Carolina." Whether the wagers are unlawful in South Carolina depends, *inter alia,* on the interpretation of such state statutory provisions as the payout limit and the prohibition on special inducements. The federal claims are thus "entangled in a skein of state law that must be untangled" before federal rights can be

adjudicated. *NOPSI,* 491 U.S. at 361, 109 S.Ct. 2506.

The same is true of plaintiffs' allegations of mail fraud and wire fraud as RICO predicate acts. Success on these claims requires proof of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. "The mail and wire fraud statutes do not define fraud but rather leave that definition to other laws." *Brennan v. Chestnut,* 973 F.2d 644, 646 (8th Cir.1992) (citations omitted). Here plaintiffs' allegations of fraud and illegal conduct rest entirely on whether defendants have violated the state laws at issue. The existence of these violations is, in turn, best left to the state courts to determine. Indeed, "RICO jurisprudence is replete with examples of failed attempts to dress up state law claims as suave RICO cases using the expansive definition of mail and wire fraud." *Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 963 (7th Cir. 1996).

As plaintiffs' complaint shows, their entire theory of liability rests on the premise that defendants have violated statutory provisions governing gambling activity, such as the $125 payout limit. There can be no "false, fraudulent, or illegal" conduct unless plaintiffs first prove the underlying state law violations. Indeed, plaintiffs allege state law fraud claims that depend on asserted violations of several of the same underlying statutes as their federal RICO claims. And as we have noted, the interpretation and application of these statutes is a matter properly left in state hands.

Of course, federal courts decide questions of state law in innumerable contexts. Abstention remains the exception and the exercise of congressionally mandated juris-

---

claim that plaintiffs pretextually packaged their state law claims as federal law claims in an effort to gain access to federal court. Nor do we claim that such federal claims are not cognizable simply because they incorporate state law. Rather, we observe simply that

one of the reasons for abstention is to ensure that federal statutes like RICO do not become vehicles for federal judicial resolution of all sorts of disputed questions of state law at the heart of the state police power.

diction remains the rule. *See Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236. Nonetheless, the state system does possess greater competence than the federal courts to decide questions of state law impacting state public policy, especially where state courts can fully vindicate any federal interest that may arise. *Burford* abstention requires that we assess the interest in having federal rights adjudicated in federal court against state interests in the control of state regulatory programs. *See Quackenbush*, 517 U.S. at 728, 116 S.Ct. 1712. The adequacy of state court review diminishes plaintiffs' interest in a federal forum. *See Alabama Pub. Serv. Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 349, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) ("As adequate state court review of an administrative order based upon predominantly local factors is available ... intervention of a federal court is not necessary for the protection of federal rights."). Here the inquiry militates in favor of abstention because state courts possess concurrent jurisdiction over plaintiffs' RICO claims. *See Tafflin v. Levitt*, 493 U.S. 455, 467, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). Indeed, the Supreme Court has affirmed its "full faith in the ability of state courts to handle the complexities of civil RICO actions, particularly since many RICO cases involve asserted violations of state law ... over which state courts presumably have greater expertise." *Id.* at 465, 110 S.Ct. 792.

### C.

It is not only the predominance of state law issues affecting state public policy that counsels caution on the part of federal courts. The district court also overreached when it effectively commandeered South Carolina's enforcement efforts in this area of state prerogative. Federal equitable intervention risks the disruption of state efforts to establish a coherent policy with respect to video poker, *see NOPSI*, 491 U.S. at 361, 109 S.Ct. 2506,

and threatens the creation of a patchwork of inconsistent enforcement efforts.

A variety of state actors have been involved in crafting and implementing the state regulatory scheme at issue. Enforcement decisions rest with state agencies and dispute resolutions rest with state judicial and quasi-judicial officers. As noted in section I, *supra*, the Department of Revenue and the State Law Enforcement Division have been invested by statute with the authority to enforce state gaming laws. *See* S.C.Code Ann. §§ 12–21–10, 23–3–15. The legislature has also specifically charged the DOR with the task of promulgating regulations governing video poker. *See* S.C.Code Ann. § 12–21–2798. The ALJ Division has jurisdiction over many disputes arising from enforcement of video gaming laws, including protests of DOR determinations. *See* S.C.Code Ann. §§ 12–60–1320. And the state court system hears cases involving all aspects of video poker brought by both private litigants and state agencies. Each of these institutions must contend with the statutory ambiguities and terms of art, the delicate policy dilemmas, and the resource allocation decisions that pervade this state regulatory program.

Indeed, the Attorney General of South Carolina withdrew from this case as to all issues save the question of whether video poker violated the state constitution's prohibition of lotteries. He did so noting that the General Assembly had delegated the task of enforcing the video gaming regulatory scheme to the administrative arm of state government. The Attorney General indicated further that it was his practice to defer to the DOR on the construction of state regulatory statutes. He stated: "For many years, it has been the policy of the Attorney General to leave regulatory matters to the regulators.... In construing state regulatory statutes, we generally defer to the administrative agency charged with statutory enforcement." The position of the state's chief law enforcement officer on the significant enforcement role accord-

ed state regulatory agencies should have discouraged the district court from assuming a substantial enforcement and interpretative role itself.

In granting the injunction, the district court effectively established parallel federal and state oversight of the South Carolina video poker industry. The particulars of the injunctive decree are instructive.

The district court imposed on defendants an extensive set of requirements as an "enforcement mechanism." For example, the court mandated that defendants post a "clarifying sign" on each video poker machine. It even prescribed the precise language that the sign must contain:

> Regardless of the number of credits accumulated or the size of the jackpot displayed on this machine, no cash payout will be made in excess of $125. All other credits remaining at the conclusion of play will be deleted from the machine. You will be required to sign for and provide identifying information to receive a cash payout.

The court further mandated that "[t]he sign must be of a size, type and configuration intended to attract the players' attention and must be placed to ensure that players' attention is drawn to the sign." A copy of the sign was attached to the court order.

The district court also required defendants to maintain detailed logs containing personal information about each recipient of a video poker payout. The court stated:

> The defendants subject to this order shall maintain a log or require locations who lease their machines to maintain a log that fully identifies the person receiving any cash payout by name, address, phone, social security number and some form of identification. The log will indicate the number of credits at the conclusion of play, the credits converted to cash, the amount of cash paid out, and the number of credits deleted. It will also reflect (by ticket number) and shall have attached all relevant documentation such as the payout slips printed by the machine.

The court required that the log be signed by both payees and employees. A sample form was attached to the court order along with instructions: "Absent court approval to the contrary, defendants shall use a form substantially similar to the attached form."

The district court imposed other requirements as well. For example, defendants were notified that "[t]he logs required above shall be made available on request to appropriate law enforcement agencies, this court, or counsel for plaintiffs" and that "[i]f requested by plaintiffs, the logs must be provided within three business days of receipt of the request." Defendants who were lessors of video poker machines were required to confirm lessees' compliance with these enforcement mechanisms and to report any violations to the district court. The court also warned that "[d]epending on the circumstances demonstrated, noncompliance by locations may be considered contempt by both the location and the lessor." Defendants were supplied with this advice as well: "The court will suggest but will not require that the defendants with the capacity to do so program their machines to automate the required process."

These "enforcement mechanisms" are exactly the types of requirements ordinarily prescribed by state statutes or state enforcement agencies. If the state agencies responsible for enforcement had wished to step up their enforcement of the payout limit, they had a rich panoply of options open to them. Just to name a few, they presumably could have conducted inspections and audits, pursued statutory remedies, and even imposed requirements like those designed by the district court.

The district court, however, simply took matters into its own hands in the belief that DOR and SLED enforcement efforts had been inadequate. The court criticized these efforts at several junctures. It not-

ed that the 1993 DOR *Guide to Conducting Video Gaming Establishments in South Carolina* discussed log requirements but that the court had "no information as to why this very logical procedure has not since been followed" and that there was "no evidence that the log requirements have, in fact, been enforced." The district court also disapproved of the current practice of assessing $500 fines for regulatory violations because video poker operators could simply treat the fine "as a cost of doing business." The court concluded that "there is no deterrent effect in the current enforcement scheme" and then issued its far-reaching injunctive decree.

Though doubtless guided by the best of intentions, the trial court strayed beyond its proper role. Whether even to permit video poker in the first place is a quintessential state decision. And it is certainly for the state regulatory system—and ultimately for the people of South Carolina—to decide how best to implement their state gaming policy and to remedy any violations. Federal equitable forays into such state enforcement schemes risk the creation of confusing, duplicative directions that cause friction and impermissibly transfer power from democratically accountable state officials to life-tenured federal judges. Federalism does not countenance one cook too many stirring the state brew.

The fact that the district court enjoined only eight of the sixty named defendants further underscores the problems that can stem from federal judicial assumption of state enforcement power. The district court allowed plaintiffs to select these defendants as the targets of an enforcement effort. Those defendants in turn complain that this selectivity will only have an anticompetitive effect on the industry without substantially contributing to the cure of plaintiffs' gambling addictions. They contend that the district court's decree will simply cause customers to go elsewhere: "The only effect of this injunction is to decrease or eliminate the business of the enjoined defendants, thereby costing several hundred employees their jobs, while increasing the business of non-enjoined defendants and non-defendants, dollar-for-dollar." Whether or not these assertions are correct is not for us to determine. Decisions concerning the allocation of enforcement resources are precisely the ones that are normally made by duly ordained state enforcement agencies and tribunals and not by federal courts.

The district court thus determined not only how to implement the state's video gaming laws, but also toward whom enforcement efforts should be directed. It is by no means certain, however, that South Carolina would have chosen to enforce its law in the precise manner dictated by the district court or that it would have decided to enforce it against these particular video poker operators. The legislature had already entrusted these types of decisions to state regulatory agencies, and it is in state hands that these decisions should have remained.

A state's interest in maintaining uniform regulation in an area of core state concern has long been a factor counseling abstention. *See, e.g., Quackenbush,* 517 U.S. at 725, 116 S.Ct. 1712; *Burford,* 319 U.S. at 326–30, 63 S.Ct. 1098. Federal intrusions into state regulatory affairs may lead to "contradictory adjudications by the state and federal courts." *See Quackenbush,* 517 U.S. at 725, 116 S.Ct. 1712. Abstention enables the federal courts to respect state wishes to "prevent the confusion of multiple review of the same general issues." *See Burford,* 319 U.S. at 326, 63 S.Ct. 1098. In superceding the enforcement efforts of DOR and SLED with a detailed yet selective program of its own, the district court set itself up as an active participant in fashion-ing state public policy. When the federal courts step uninvited into the shoes of state courts and state enforcement agencies, there exists a needless risk of tension between the two systems and conflicting mandates for those affected by state regulation. *See Burford,*

319 U.S. at 327, 334, 63 S.Ct. 1098 ("sound respect for the independence of state action" may require abstention to avoid "needless federal conflict with [a] state policy"). Legal constraints cannot yield even to the noblest of intentions, for judicial visions of the social good will differ from issue to issue and from judge to judge, and will, if allowed to run unchecked, thwart the expression of the democratic will.

### D.

The basis used by the district court for its injunctive order further underscores the advisability of abstention. The district court's reliance on its "inherent equitable power" in granting the relief made federal encroachment on the state's regulatory domain all the more invasive.

No federal statute expressly authorized the relief that plaintiffs sought. While section 1964(c) of RICO grants private parties a right to seek treble damages from a RICO violator, it makes no mention whatever of injunctive or declaratory relief. *See Dan River, Inc. v. Icahn*, 701 F.2d 278, 290 (4th Cir.1983). We have therefore stated that "[t]here is substantial doubt whether RICO grants private parties ... a cause of action for equitable relief." *Id.* This doubt is especially acute in light of the fact that Congress has declined to authorize injunctive remedies for private parties. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 155, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (noting that Congress failed to enact bill that would have permitted private actions for injunctive relief under RICO). In fact, the only circuit to have squarely addressed the question held that "injunctive relief is not available to a private party in a civil RICO action." *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir.1986).

Nor does any state statute clearly permit a private party to obtain equitable relief, either injunctive or declaratory, in this case. The district court observed that the availability of an injunction to private plaintiffs under SCUTPA was "doubtful." The court therefore properly declined to issue the injunction under the authority of SCUTPA. And neither the payout limit provision, S.C.Code Ann. § 12–21–2791, that the district court was enforcing nor any other part of the Video Game Machines Act makes an equitable remedy available to private parties.

Thus, without a statutory basis on which to proceed, the district court relied on its "inherent equitable power" to grant the injunction. We decline, however, to endorse such a broad and open-ended assertion of federal judicial power over core state concerns. The Supreme Court noted in *Quackenbush* that the power to abstain is located "in the historic discretion exercised by federal courts sitting in equity." 517 U.S. at 718, 116 S.Ct. 1712 (internal quotation marks omitted). And " '[t]he history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction.' " *Id.* at 717, 116 S.Ct. 1712 (quoting *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941)). Federal courts have the authority to decline to exercise this jurisdiction precisely because " '[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies.' " *Id.* at 717–18, 116 S.Ct. 1712 (quoting *Pullman*, 312 U.S. at 500, 61 S.Ct. 643).

Despite the admonition that federal courts should "restrain their authority because of 'scrupulous regard for the rightful independence of the state governments,' " *id.* at 718, 61 S.Ct. 643 (quoting *Pullman*, 312 U.S. at 501, 61 S.Ct. 643), the district court took the most discretionary route of all in issuing its injunction. The decision to grant an equitable remedy is generally discretionary even with express statutory authorization. But the district court exercised discretion atop discretion when it reached to its "inherent equitable power"

to remedy asserted violations of a state statute intimately affecting state public policy which nowhere con-templates injunctive orders at the behest of a private party.

The Supreme Court has rejected the "expansive view" that equity jurisdiction vests federal courts with "a general power to grant relief whenever legal remedies are not practical and efficient." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 1969, 144 L.Ed.2d 319 (1999). Indeed, the unbounded exercise of equitable powers would be "the most formidable instrument of arbitrary power[] that could well be devised." *Id.* at 1974 (internal quotation marks omitted). "It would literally place the whole rights and property of the community under the arbitrary will of the Judge...." *Id.* (internal quotation marks omitted). The district court should therefore have treaded far more lightly than it did. Without a solid foundation in statute for its remedy and with the substantial risk of compromising the independence of state regulatory policy and efforts, the case was a classic one for the exercise of *Burford* abstention.[6]

## IV.

■ "[F]ederal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." *Quackenbush*, 517 U.S. at 731, 116 S.Ct. 1712. This includes claims for both injunctive and declaratory relief. *See id.* at 718–19, 116 S.Ct. 1712. There remain, however, plaintiffs' claims for damages. The Supreme Court in *Thibodaux* confirmed the applicability of abstention principles to an action at law. 360 U.S. at 28, 79 S.Ct. 1070. In that case, a city brought an eminent domain action against a corporation that was removed to federal court

on diversity grounds. *See id.* at 25, 79 S.Ct. 1070. The Court affirmed the district court's decision to stay the case on abstention grounds, concluding that "[t]he considerations that prevailed in conventional equity suits for avoiding the hazards of serious disruption by federal courts of state government or needless friction between state and federal authorities are similarly appropriate in a state eminent domain proceeding" in federal court. *Id.* at 28, 79 S.Ct. 1070.

Just three years ago in *Quackenbush*, the Supreme Court made clear that "*Burford* might support a federal court's decision to postpone adjudication of a damages action pending the resolution by the state courts of a disputed question of state law." 517 U.S. at 730–31, 116 S.Ct. 1712. In doing so, the Court noted that although the power to abstain is rooted in the equitable powers of federal courts, it had "not treated abstention as a technical rule of equity procedure" and had "not strictly limited abstention to equitable cases." *Id.* at 718, 730, 116 S.Ct. 1712.

But the Court did make one distinction between the application of *Burford* abstention to damages claims and its application to claims for discretionary relief. Specifically, the Court held that *Burford* can support only a stay, and not the outright dismissal or remand, of a damages action. *See id.* at 721, 730, 116 S.Ct. 1712 ("a federal court cannot, under *Burford*, dismiss or remand an action when the relief sought is not discretionary"). This will sometimes require that the damages portion of an action remain in federal court while claims for equitable relief are dismissed entirely. Indeed, cases have been parsed in this manner even before *Quackenbush* and even where such parsing resulted in some bifurcation of proceedings between state and federal courts. *See, e.g., Deakins v. Monaghan*, 484 U.S. 193,

---

6. While we leave it to the discretion of the district court whether to dismiss or to remand to state court the claims for equitable relief, we do note that a remand would promote a

more expeditious resolution of these claims in state court and vindicate plaintiffs' decision to bring these claims in the proper forum in the first place.

204–05, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988) (ordering district court to dismiss claims for equitable relief under 42 U.S.C. § 1983 on mootness grounds while requiring district court to retain jurisdiction over § 1983 damages claims).

█ In this case, much the same rationale that supports dismissal or remand of the claims for injunctive relief also supports a stay of plaintiffs' claims for damages. Most importantly, there remain a number of disputed questions of state law yet to be resolved by the state courts. For example, the state courts have not yet determined whether plaintiffs' gambling losses can constitute an "unlawful debt" actionable under RICO. In addition, the questions of whether violations of the Video Game Machines Act are actionable as state common law offenses of fraud, negligent misrepresentation, unjust enrichment, and the like are unsettled.

Even some of the issues addressed by *Gentry* have not been wholly resolved for purposes of this litigation. The *Gentry* case addressed no more than the propriety of a state trial court's dismissal of claims at the pleading stage. For instance, *Gentry* has not yet endorsed the district court's view that violations of the payout limit were unfair trade practices as a matter of law. Rather, *Gentry* noted simply that "advertising a 'jackpot' *could* be a violation of the [SC]UTPA and dismissal of

this cause of action is not appropriate *at this stage of the proceedings.*" 1999 WL 525440, at *4 (emphasis added). There is a difference between the district court's determination that plaintiffs prevail on this issue as a matter of law and *Gentry*'s rejection of the view that the plaintiffs there could not prevail under any circumstances.

It is impossible for an appellate court to anticipate all of the factors that may at some point come to bear on the district court's stay of a damages claim. With plaintiffs' equitable claims no longer in federal court, it is possible that parallel state actions may develop between the parties and may come to include claims for both discretionary relief and damages. We trust that the district court will monitor the continued advisability of staying the damages claims with the same healthy regard for the concerns of federalism that have been outlined herein.[7]

## V.

Like other abstention doctrines, *Burford* abstention is "not [a] rigid pigeonhole[ ] into which federal courts must try to fit cases." *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 11 n. 9, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Rather, it "reflect[s] a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." *Id.*

---

7. We are pleased that our fine concurring colleague agrees that *Burford* abstention was appropriate in this case. The concurrence emphasizes a number of meritorious points—for example, that the state regulatory scheme at issue here is sufficiently comprehensive to implicate the concerns underlying *Burford* abstention; that the unquestionably exclusive state law nature of the dispute, coupled with the intensely state character of gaming policy, counseled abstention in this case; and, finally, that *Burford* abstention is indeed the exception, not the rule, and federal courts must ordinarily exercise congressionally mandated jurisdiction. In fact, it is difficult to discern from our concurring colleague what exactly is the area of difference.

Evaluating questions of *Burford* abstention requires a careful examination of the facts

and circumstances of a given case. Far from resulting in an "expansive" statement of *Burford* abstention, it is precisely a specific and detailed analysis of these particular facts and circumstances that ensures that *Burford* abstention will remain well anchored. Were we to follow the abbreviated and generalized course our colleague seems to prefer, we would risk paving the way for unconstrained expansion of the *Burford* abstention doctrine. Finally, careful appellate review of district court decisions with close attention to the facts and the record is a mark of respect for district courts—not a "reprimand." And, as Justice Black understood in *Burford* itself, a carefully limited application of the doctrine can relieve federal-state tensions through the exercise of federal judicial self-restraint.

These considerations counsel abstention especially where, as here, state actors are charged with resolving state law issues that intimately affect state regulation of a core state concern. The risk of federal-state tensions was acute in a controversy that the district court itself deemed "hotly contested" and fraught with "thorny" state law issues. The fact that an issue such as video poker ignites opposing passions is no reason to remove it from the purview of state policy. Indeed, if states were relegated to bland and temperate fare, we would not have much of a federal system.

It takes little imagination to understand that the sweeping equitable authority asserted by the district court could easily be expanded to establish federal judicial sway over many significant state policies, functions, and institutions. We do not believe that the Supreme Court would stand for that. We therefore vacate the injunction and remand this case with directions to dismiss or remand to state court all claims for equitable relief and to stay proceedings on claims for damages pending the resolution by the state courts of disputed questions of state law.

*VACATED AND REMANDED WITH DIRECTIONS*

LUTTIG, Circuit Judge, concurring in the judgment:

I concur in the judgment of the court. I do not join the court's opinion, however, because I do not subscribe to the expansive statements of the *Burford* abstention principle set forth therein or, more fundamentally, to the view of federal jurisdiction that underlies those statements.

Notwithstanding the court's nod to congressionally mandated jurisdiction, unmistakable in the prolix of the majority opinion is the view that statutes conferring jurisdiction on the federal courts should be interpreted very narrowly and, correspondingly, prudential exceptions to such congressionally conferred jurisdiction construed very broadly, to the end that federal courts remain tribunals of limited jurisdiction. This is a view accepted and advanced by many on the bench, and, given the trend toward federalization generally, it is understandable and reasonable. But, at bottom, this view is one of policy, not law itself. As a consequence, it is not a view that may permissibly influence our interpretations of statutes or, as here, our shaping of prudential exceptions.

As inferior courts, we derive our very existence from the Congress, and we accept our jurisdiction largely from that Branch. It is, of course, Congress' obligation to provide us with the resources necessary to manage the work that is parceled to us by that body, but if the Legislature wishes that we serve as the arbiters of a class of disputes, then we are affirmatively obliged to do so, regardless of our personal assessment of the wisdom of that decision. It is not ours either to interpret the statute at issue narrowly or to expand our own judicial engraftations because we disagree with the Congress that our doors should be open to such disputes. And this is whether the jurisdiction-conferring statute is more general in character, such as 28 U.S.C. § 1291 (appeal from final orders) or 28 U.S.C. § 1441 (removal jurisdiction), or more specific, such as, for example, 42 U.S.C. § 1983 (civil actions for constitutional deprivations) or 18 U.S.C. §§ 1961–1968 (civil RICO actions). If the Congress sees fit to provide citizens with a particular cause of action, then we as federal courts should entertain that action—and unbegrudgingly.

In this regard, I very much share the view expressed by Justice Frankfurter in *Burford* itself, wherein he commented of the diversity jurisdiction that supplied the source of federal authority in that case that:

Whether it is a sound theory, whether diversity jurisdiction is necessary or desirable ... whether the federal courts ought to be relieved of the burden of diversity jurisdiction,—these are matters which are not my concern as a judge. They are the concern of those

whose business it is to legislate, not mine.... I must decide this case as a judge and not as a legislative reformer. *Burford,* 319 U.S. at 337, 63 S.Ct. 1098 (Frankfurter, J., dissenting).

Consonant with this view of our role vis-a-vis congressional conferral of jurisdiction, I would in this case observe of the federal RICO statute what Justice Frankfurter observed in *Burford* of diversity jurisdiction: Congress has vested the federal courts with jurisdiction over civil RICO claims and, accordingly, "I must decide this case as a judge and not as a legislative reformer," without regard to any personal views as to the wisdom of that legislation. Or, as specifically relevant here, I must do so without regard to any personal views as to the advisability of abstention from the decision of cases brought under that legislation. I would then, as required of us by the applicable Supreme Court precedent, interpret the *Burford* abstention doctrine correspondingly narrowly. And I would add little else by way of rhetorical applause for a different view. I am not averse to flourish, in its place. It is only that I do not regard this as a case particularly well suited for it, or at least not suited for an abundance of it. I fear that the excess flourish here may give rise to a sense that we have decided the case not based upon law (which we have, and correctly I think), but, rather, upon our policy views as to the appropriate character of the federal judiciary (which, I assume, we have not)—alone an unfortunate consequence. But, more importantly, I believe that the particular rhetoric in the majority opinion, and in the amount in which it is employed, effectively works a substantive change in the law of abstention from a doctrine of exception to a doctrine of rule more assuredly than if the court had explicitly altered the underlying standards themselves.

The majority characterizes my objection to its opinion as an objection to what it asserts, by negative inference, is its "specific and detailed analysis of the[ ] particular facts and circumstances" and its "close attention to the facts and the record" in the case, *see ante* at 728 note 7. It suggests that I propose an "abbreviated and generalized course" in contrast to the majority's rigorous legal analysis, *id.,* one that would actually be less solicitous of federal jurisdiction than the majority's. But for the majority's apparent belief otherwise, I would have thought it obvious from the foregoing (but, self-evident in any event) that I do not object in this case (or ever, for that matter) to "specific and detailed analysis of the[ ] particular facts and circumstances" or to "close attention to the facts and the record." I would have thought it clear (and, frankly, unavoidably so) that my objection is simply to the majority's *over* use of its particular rhetorical sound-bites in a case ill-suited for such, the inevitable consequences being both that the court could fairly be seen as having decided this case based solely upon its policy predilections and that future applications of the underlying rule of law that we actually do consider herein will be influenced—and influenced wrongly—in the direction of the policy rhetoric. *See, e.g., ante* at 720 ("State gaming policies reflect a delicate trade-off between the economic boon of increased tax revenue and enhanced employment on the one hand and the risk of moral rot, human exploitation, and political corruption on the other. Put another way, the question is whether the maximization of individual freedom and choice works a wholesale diminution in general social well-being."); *id.* at 720 ("The district court erred then in manning the rudder of this aspect of state gaming policy when it decided for itself that violations of the payout limit were unfair trade practices as a matter of law."); *id.* at 721 ("Navigating such issues without definitive state court guidance brings federal courts into treacherous waters of state political controversy."); *id.* at 722 ("The necessity of abstention as a prophylactic for state prerogative in such cases is clear. If it were unavailable, then the federal

courts might adjudicate all kinds of disputes involving the most sensitive questions of state law and policy that arrive at their door under the guise of federal claims."); *id.* at 722 ("Federal statutes such as RICO that incorporate state law violations as bases for federal relief would become Trojan horses. Issues of purely state public policy would have safe passage into the federal courthouse and burst forth inside its walls. This would in time endanger the independence of state policy at the core of state police power and cause friction between the federal and state systems."); *id.* at 722 ("RICO jurisprudence is replete with examples of failed attempts to dress up state law claims as suave RICO cases using the expansive definition of mail and wire fraud.") (quoting *Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 963 (7th Cir.1996) (Evans, J.)); *id.* at 723 ("Federal equitable intervention risks the disruption of state efforts to establish a coherent policy with respect to video poker and threatens the creation of a patchwork of inconsistent enforcement efforts."); *id.* at 725 ("Federal equitable forays into such state enforcement schemes risk the creation of confusing, duplicative directions that cause friction and impermissibly transfer power from democratically accountable state officials to life-tenured federal judges. Federalism does not countenance one cook too many stirring the state brew."); *id.* at 725 ("When the federal courts step uninvited into the shoes of state courts and state enforcement agencies, there exists a needless risk of tension between the two systems and conflicting mandates for those affected by state regulation."); *id.* ("Legal constraints cannot yield even to the noblest of intentions, for judicial visions of the social good will differ from issue to issue and from judge to judge, and will, if allowed to run unchecked, thwart the expression of the democratic will."); *id.* at 728–29 ("The risk of federal-state tensions was acute in a controversy that the district court itself deemed 'hotly contested' and fraught with 'thorny' state law issues. The fact that an issue such as video poker ignites opposing passions is no reason to remove it from the purview of state policy. Indeed, if states were relegated to bland and temperate fare, we would not have much of a federal system."); *id.* at 729 ("It takes little imagination to understand that the sweeping equitable authority asserted by the district court could easily be expanded to establish federal judicial sway over many significant state policies, functions, and institutions."). *Compare generally,* J. Harvie Wilkinson III, *Fear of Federalism,* Washington Post, Nov. 26, 1999, at A45.

Turning to the merits of the question whether the district court abused its discretion in not abstaining under the circumstances, I believe, like the majority, that it did. Although the scope of the gaming regulations in South Carolina is different from the scope of the oil production regulations at issue in *Burford,* it seems to me that the difference is one of degree only, and not one of such degree as to render the South Carolina regulatory scheme insufficiently comprehensive to implicate the concerns that prompted creation of the abstention doctrine in *Burford.* I also believe that the gambling business, if not the quintessentially local issue that the majority concludes it is, is imbued with sufficient local character that the state courts ought be accorded comity from the federal courts with respect to its regulation.

Further, as the majority explains, it is unquestionable that, for all intents and purposes, the dispute centered exclusively on state law and, moreover, on the resolution of state law issues that theretofore had never been addressed by the courts of South Carolina. Indeed, of especial significance, at the very time that the district court declined to abstain, there were proceedings pending in the state supreme court that all knew would likely resolve any number of the unresolved state law issues that the district court perforce ended up deciding (albeit, in retrospect, correctly) in the first instance.

Finally, as I allude to below, in my view the fact itself that those state officials charged with administering and enforcing the gaming laws anxiously surrendered their responsibilities to the federal court suggests the appropriateness of staying the federal hand. When state officials so readily cede their power on local issues peculiarly within their province, the federal judicial instinct should be one of wariness about the appropriateness of federal involvement. For it is not infrequently the case that these officers are less altruistically concerned with the proper allocation of authority between the state and federal courts and more interested in unburdening themselves of controversial political issues which they had rather not decide themselves.

In light of all of these circumstances confronting the district court, I am satisfied that abstention was counseled.

At the same time that I believe that the district court should have abstained, however, I do believe that the question is considerably closer than, or at least would have appeared to the district court closer than, the majority does. After all, it was the *defendants* who removed the case to federal court from state court, wherein the plaintiffs had brought their suit. Even if technically irrelevant, it is at least discomforting that the same parties who sought removal to federal court then seized upon the discretionary doctrines of that court to argue that the case should not even have been in that tribunal. Likewise, although the defendants lodged the obligatory protest to the exercise of federal jurisdiction, it is evident that they hardly chafed at being before the federal court, as opposed to the state courts. And, though in the final analysis I actually consider it a weighty consideration in favor of abstention, it was not unreasonable for the district court to think that the concerns for the state interests involved were allayed when the South Carolina Attorney General promptly excused himself from the federal proceeding altogether, confirming his willing acquiescence in (if not, the truth be known, his exuberance for) the prospect of federal resolution of the politically controversial issues raised by the litigation.

Added to these considerations is that there was no apparent reason to regard the civil RICO claims as pretextual, notwithstanding the majority's inapt description of these claims as a collective "Trojan horse." (The claim was made by the plaintiffs, not the defendants, and in state court, not in federal court.) In fact, a fair reading of their initial complaint in state court might well suggest that the RICO claims were the plaintiffs' principal claims. And, of course, we now know from *Gentry v. Yonce*, 522 S.E.2d 137 (S.C. 1999), that the South Carolina Supreme Court believes that the plaintiffs' state law claims could serve as RICO predicates.

Finally, this was a dispute among private parties, not a private challenge to an administrative order of the State—the customary context in which the abstention issue is presented—and the principal legal issue was, as these things go, fairly straightforward, freestanding of state law nuance, and well within the competence of the federal district court to decide.

In the aggregate, these factors cause me to conclude at least that the abstention question appeared much closer than the majority concludes it was, and therefore that the round criticism of the district court by the majority is undeserved. Therefore, much as I would do with respect to the articulation of the abstention principles themselves, I would, without fanfare, simply explain the rationale for abstention under the circumstances of the case and leave it at that. I am confident that this district court is neither in need of reprimand, nor deserving of the special "respect" that the majority believes it has accorded that court, *see ante* at 728 note 7. *See ante* at 720 ("The exercise of federal equitable discretion in this case supplanted the legislative, administrative, and judicial processes of South Carolina and sought to arbitrate matters of state law and regula-

tory policy that are best left to resolution by state bodies."); *id.* at 720 ("The district court erred then in manning the rudder of this aspect of state gaming policy when it decided for itself that violations of the payout limit were unfair trade practice as a matter of law."); *id.* at 721 note 4 ("The [district] court would have been better advised, of course, to remain silent on this issue altogether rather than offering its 'tentative position' as 'dicta' and hinting that it might make its position final before *Gentry.* Restraint on all of these disputed state law questions was a preferable course to picking and choosing which unsettled issues to decide and which to defer."); *id.* at 723 ("It is not only the predominance of state law issues affecting state public policy that counsels caution on the part of federal courts. The district court also overreached when it effectively commandeered South Carolina's enforcement efforts in this area of state prerogative."); *id.* at 724 ("The district court, however, simply took matters into its own hands in the belief that DOR and SLED enforcement efforts had been inadequate."); *id.* at 724 ("The [district] court concluded that 'there is no deterrent effect in the current enforcement scheme' and then issued its far-reaching injunctive decree."); *id.* at 724 ("Though doubtless guided by the best of intentions, the trial court strayed beyond its proper role.... Federal equitable forays into such state enforcement schemes risk the creation of confusing, duplicative directions that cause friction and impermissibly transfer power from democratically accountable state officials to life-tenured federal judges."); *id.* at 725 ("The district court thus determined not only how to implement the state's video gaming laws, but also toward whom enforcement efforts should be directed."); *id.* at 725 ("In superseding the enforcement efforts of DOR and SLED with a detailed yet selective program of its own, the district court set itself up as an active participant in fashioning state public policy."); *id.* at 726 ("The district court's reliance on its 'inherent equitable power' in granting the relief made federal encroachment on the state's regulatory domain all the more invasive."); *id.* at 727 ("[T]he district court exercised discretion atop discretion....").