FILED: March 9, 2000

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOAN CALDWELL JOHNSON; LORRAINE
WITHERSPOON BAKER; DANNY KAY
SMITH; SARA EDELL BOAN; DEANNA
KAY FRANS; DARRYL BERNARD EPPS;
ANDREW NOBLES; JOSEPH CHESTER
WALKER; WILLIAM JOSEPH HARNETT,
JR.; BRUCE ANDERSON; WILLIAM BELL;
FAYE BLAYLOCK; MIKE BREWER; MIKE
BROWN; RONALD CALLAHAN; SANDRA
COULTER; LISA CRUM; ANDREAS
DRUTIS; CRYSTAL GAYLE EDWARDS;
BUSTER ELFIN FLOYD; GEORGE HENLEY;
LORETTA JONES; MARGARET LOCKLEAR;
TAMMY LOCKLEAR; LINDA MCCLEOD;

WILLIAM MCCORMICK; HUGH MEISE;

PATTY MILLER; GARY PADGETT; MARY
PINCHBACK; VARDRY PITTMAN; ALBERT
J. SAMRA; MASON SKEENES; JIM STOLZ;
AMBER STRICKLAND; CHARLES STUBBS;
LONYA THIGPEN; JAMES THOMPSON;
JESSIE WILLIAMS; VALERIE WILLIAMS,
and on behalf of themselves and all
others similarly situated; STATE OF
SOUTH CAROLINA; ex rel., CHARLES M.
CONDON, in his official capacity as
Attorney General,
Plaintiffs-Appellees,

v.

No. 98-2225(L)

(CA-97-2136-3-17)

COLLINS ENTERTAINMENT COMPANY, INCORPORATED; AMERICAN AMUSEMENT COMPANY, INCORPORATED; AMERICAN AMUSEMENT OF AIKEN, INCORPORATED; JOYTIME DISTRIBUTORS & AMUSEMENT, INCORPORATED; RED DOT AMUSEMENTS; CBA GAMES, INCORPORATED; BEST AMUSEMENT COMPANY; GREENWOOD MUSIC COMPANY, INCORPORATED; ACE AMUSEMENT, LLC; B&J AMUSEMENT; BROYLES & LUTZ, INCORPORATED; CAROUSEL AMUSEMENTS; COLEY, INCORPORATED; DREW INDUSTRIES; FAST FREDDIES; GREAT GAMES, INCORPORATED; H&JOF SOUTH CAROLINA, INCORPORATED; HOLLIDAY AMUSEMENT COMPANY OF CHARLESTON, INCORPORATED; HOYTS MUSIC COMPANY, INCORPORATED; HUCKLEBERRY AMUSEMENT, INCORPORATED; INGRAM INVESTMENTS; J. M. BROWN AMUSEMENT COMPANY, INCORPORATED; LARRY WOLFE AMUSEMENT; MHJ CORPORATION; MHS ENTERPRISES, INCORPORATED; MARTIN COIN MACHINE, INCORPORATED; MCDONALD AMUSEMENT COMPANY; MIDLANDS GAMING CORPORATION; ORANGEBURG AMUSEMENT, INCORPORATED; PEDROLAND, INCORPORATED; R. L. JORDAN OIL COMPANY OF NORTH CAROLINA; ROSEMARY COIN MACHINES OF FLORENCE, INCORPORATED; SCOTT'S VENDING INCORPORATED OF COLUMBIA; SUMTER PETROLEUM COMPANY; TIM'S AMUSEMENT, INCORPORATED; VIDEO-MATIC

2

AMUSEMENTS, INCORPORATED; H. HUGH
ANDREWS, II; PAMELA A. ANDREWS;
DWAYNE I. BOHANNON; J. M. BROWN;
DON E. BROYLES; GRACE E. COLEY;
FRED COLLINS; J. SAMUEL COX;
KENNETH G. FLOWE; CAREY HARDEE;
SCOTT G. HOGUE; LOWELL E. HOLDEN;
PATRICIA HOLLIDAY; WARREN P.
HOLLIDAY; HENRY E. INGRAM; STEVEN
E. LIPSCOMB; TIM MAHON; JIMMY
MARTIN, JR.; CYNTHIA MCDONALD;
JAMES MCDONALD; ALLAN SCHAEFER;
DAVID R. SIMPSON; RON SPENCER;
MICKEY H. STACKS; WILLIAM DARWIN
WHEELER; HERSHEL L. WILLIAMSON; A.
J. WILSON, JR., in their individual and
corporate capacities as representatives
of all others similarly situated,
Defendants-Appellants.

_____

**O R D E R**

Appellees filed a petition for rehearing with suggestion for rehearing en banc.

The panel voted to deny rehearing.

A member of the Court requested a poll on the suggestion for rehearing en banc. Judges Murnaghan, Michael, Motz, and King voted to grant rehearing en banc. Chief Judge Wilkinson, and Judges Widener, Niemeyer, and Luttig voted to deny rehearing en banc. Judges Wilkins, Williams, and Traxler did not participate in the poll of the Court on the suggestion for rehearing en banc. As the petition for rehearing en banc failed to receive the support of the majority of judges in regular active service, it is hereby DENIED.

Entered at the direction of Chief Judge Wilkinson for the Court.

3

For the Court

/s/ Patricia S. Connor
_____
Clerk

WILKINSON, Chief Judge, concurring in the denial of rehearing en banc:

I concur in the denial of rehearing en banc. My dissenting colleague endorses the unbounded assertion of federal judicial power over core state functions that the actions of the district court reflect. Such a view is utterly irreconcilable with the principles underlying our system of dual sovereignty. Under the dissent's approach, the federal chancellor's control over basic state functions will be unfettered and complete.

I shall not review in detail all of the points in the panel opinion. See Johnson v. Collins Entertainment Co., 199 F.3d 710 (4th Cir. 1999). Rather, I will briefly recapitulate the principal factors that in combination rendered the district court's refusal to abstain an abuse of discretion.

1. The district court had no basis in the South Carolina Unfair Trade Practices Act or in the Racketeer Influenced Corrupt Organizations Act for its order. Indeed, it had no basis in any state or federal statute for a sweeping injunctive decree. The court instead invoked its "inherent equitable power" to undertake a basic state regulatory function. This wholly discretionary enterprise has no logical stopping point. "Inherent" power wielded by life-tenured judges without authorization in statute over the basic functions of a sovereign state simply goes too far. Cf. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 119 S.Ct. 1961, 1969, 1974 (1999) (Equity jurisdiction does not vest federal courts with "a general power to grant relief whenever legal remedies are not practical and efficient" because "it would literally place the whole rights and property of the community under the arbitrary will of the Judge." (internal quotation marks omitted)).

2. This case has been dominated by unsettled questions of state law from the outset. These state law issues bear on policy problems

4

of substantial public importance, see New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 361 (1989) (NOPSI), at the heart of the state police power, see Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341 (1986). In fact, the state courts were addressing the questions of the payout limit interpretation and the application of state unfair competition law to the payout statute at the very time the district court rendered its pronouncements. Contrary to the dissent's characterization, these state law questions were hardly "straightforward" at the time. Indeed, the state attorney general observed in withdrawing from the case that there were at least three possible interpretations of the payout limit. Other state law issues remain unresolved. See Collins Entertainment, 199 F.3d at 728. The presence of such disputed questions of state law in an area of core state policy concern was one among many factors counseling abstention. See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728 (1996).

3. The district court's actions supplanted the efforts of the state agencies charged with the enforcement of the regulatory scheme. The court admitted as much when it prefaced its decree with pointed criticism of the enforcement efforts of the South Carolina State Law Enforcement Division and the South Carolina Department of Revenue. Such commandeering of state enforcement efforts is hardly consistent with the "scrupulous regard for the rightful independence of state governments" that the Supreme Court requires. Quackenbush, 517 U.S. at 718.

4. The district court's assumption of state regulatory prerogatives was compounded by the minute detail of its injunctive decree. The panel opinion describes at some length the detailed requirements that the district court imposed on the businesses targeted by the plaintiffs. See Collins Entertainment, 199 F.3d at 718, 724. These requirements included, among many other things, posting a "clarifying sign" with court-ordered language on each machine and keeping detailed court-ordered records about customers receiving payouts. Not only is the intricacy of the decree troubling in its own right, but such a step would likely draw the district court into an even more intrusive regulatory enterprise. If federal courts become regulators to this extent of private businesses under state regulatory auspices-- and do so with-

5

out any solid warrant in law -- the boundaries of state and federal power will become altogether indistinct.

5. The selective enforcement character of the district court's actions was also troubling. The district court allowed the plaintiffs to single out a subset of the putative defendant class for the judicially crafted enforcement regime. These decisions concerning the allocation of enforcement resources are, however, precisely the kinds of decisions that ordinarily rest in the hands of state regulatory agencies.

6. The independence of state administration of a comprehensive regulatory scheme is at stake here even though private actors are the named parties in the action. The statute at issue touches virtually every aspect of the video poker industry and every branch of state government is intimately involved in its regulation. See Collins Entertainment, 199 F.3d at 715-17, 723. The state legislature, state courts, state Administrative Law Judge Division, and two major state administrative agencies all fashion rules and policies that govern the most minute details of industry practices. See id. To claim that there is no "comprehensive administrative scheme with which to interfere," as the dissent does, simply belies reality.

Notwithstanding this web of state regulation, the plaintiffs asked the district court to step in and fashion a different enforcement scheme than the one the state agencies were implementing at the time. This was just as much an invitation to interfere with the administration of the scheme as it would have been had plaintiffs directly challenged the enforcement efforts of SLED and DOR. To restrict Burford to only those cases involving direct challenges to the operation of state regulatory regimes would violate the Supreme Court's admonitions against a "checklist" approach to abstention. See, e.g., Quackenbush, 517 U.S. at 727 (Cases "do not provide a formulaic test for determining when dismissal under Burford is appropriate."); Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 n.9 (1989) (Abstention "reflect[s] a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes."). The dissent's preoccupation with an omitted portion of a quote from NOPSI simply reflects an attachment to this impermissible checklist mentality. Indeed, the Supreme Court itself in Quackenbush omitted the reference to interference with state administrative proceedings or

6

orders in quoting the same passage from <u>NOPSI</u> on which the panel relied. <u>Compare Quackenbush</u>, 517 U.S. at 726-27, <u>with Collins Entertainment</u>, 199 F.3d at 719.

7. The state attorney general had withdrawn from this case on the ground that the state legislature had delegated the task of regulatory oversight to the administrative arm of state government. He also stated that it was his practice to defer to the Department of Revenue on the construction of state regulatory statutes and noted that the interpretation of the payout limit statute was unsettled. The position of the state's chief law enforcement officer on the roles of the respective actors in the state regulatory scheme should have cautioned the district court and underscored the advisability of abstention here.

8. In light of the myriad factors mentioned above and discussed at length in the panel opinion, it is clear that the dissent's abstract rendition of the panel's holding is mere hyperbole. Abstention analysis rests, as it always does, on an examination of the totality of the particular circumstances present in the given case.

<u>Burford</u> abstention is rooted in the law of remedies, being "derive[d] from the discretion historically enjoyed by courts of equity." <u>Quackenbush</u>, 517 U.S. at 728. The premise underlying abstention is that federal courts should not exercise expansive remedial powers when to do so would damage principles of federalism and comity to the extent that happened here. To condone the district court's actions in this case would be to endorse broad federal equitable sway over the most basic state regulatory functions. Preserving our federal system of government in any meaningful sense means not acquiescing in the vision of limitless federal judicial power manifested here.

DIANA GRIBBON MOTZ, Circuit Judge, dissenting from the denial of rehearing en banc:

A panel of this court has taken the dramatic, some would say bold, step of withdrawing our jurisdiction over an important set of cases in which federal rights are at stake. It has done so by way of an abstention principle, assertedly derived from the Supreme Court's <u>Burford</u> doctrine, but fundamentally of its own making. Because this holding involves the scope of our most basic obligation as judges--to hear

7

cases arising under the laws of the United States--a review by all of the court's active judges would seem particularly appropriate here. I regret, and dissent from, our decision not to rehear this case en banc.

The case arrived in federal district court on removal by the defendants, who are operators of video poker machines in South Carolina. Having successfully removed the case to federal court, a group of the video poker operators then proceeded to argue that federal jurisdiction was inappropriate. A panel of this court agreed, holding that the district court should have abstained, under the doctrine of Burford v. Sun Oil, 319 U.S. 315 (1943), from deciding whether the video poker operators violated South Carolina's statutorily-imposed $125 limit on payouts from video poker machines and, if so, whether this constituted a "special inducement" or an unfair trade practice under South Carolina law. The plaintiffs' RICO claim, which they had filed in state court, and upon which the defendant operators of video poker machines had based their removal to federal court, was ordered stayed. Although the panel seems to have been chiefly concerned with the asserted errors in the district court's decree, it nonetheless held that the court should have abstained altogether from hearing the case.

I do not believe the panel's decision squares with even the most expansive understanding of the Burford doctrine. The clearest recent statement on the scope of Burford comes in New Orleans Public Service, Inc. v. Council for the City of New Orleans , in which the Supreme Court held that "a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are `difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the `exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" Id., 491 U.S. 350, 361 (1988) (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 814 (1976)).

In citing this language, the panel omits the underscored part of the quote and, in doing so, omits from its holding Burford's most basic principle: that federal courts should "decline to interfere with the proceedings or orders of state administrative agencies." Here, there was

8

no interference of the sort that Burford recognizes, nor was there a comprehensive administrative scheme with which to interfere.

Read to its outer limits, Burford applies in two related sets of circumstances. First, Burford mandates that when a state has decided to reach a public policy problem through a comprehensive administrative scheme, federal courts should not "interfere" by telling state officials how to make the decisions that the state has charged them with making. In other words, federal courts should not be doing the work of local zoning boards, of family courts, of railway commissions, of water conservation authorities, or the like. This case did not raise the specter of such interference. It involved only the interpretation of state law--not the question of whether to grant a license, a permit, a variance, or of the appropriateness of alimony payments. The plaintiffs did not seek to challenge such an administrative order, and indeed, there was no administrative body to which the plaintiffs might have turned to get relief in the first instance.

Second, Burford counsels abstention when a federal court, by deciding a case, would create substantial disuniformity in a field where multiple actors have interlocking interests, and on which the state, recognizing the complexity of the field, has erected some regulatory architecture. Here, the defendants' entitlement to operate video poker machines is not interwoven with the rights of other video poker operators in the way that, quintessentially, landowners' activities fundamentally burden one another, or that the drilling of oil in a Texas field might "drain oil from the most distant parts of the reservoir." Burford, 319 U.S. at 319. Although enforcement of the law against particular actors almost always gives rise to a certain kind of disuniformity--in the sense that other actors may escape enforcement --that is not the sort of disuniformity with which Burford is concerned.

Every instance in which Burford has been applied by the Supreme Court or this court has involved a party seeking a decision that, in at least one of the two ways I have described, would have supplanted the work of an administrative agency or a state court with specialized jurisdiction. See Alabama Public Service Commission v. Southern Railway, 341 U.S. 341 (1951) (decision by commission to require railroad to continue operation of unprofitable line); Burford, supra

9

(decision by commission to grant oil drilling permit); Pomponio v. Fauquier County Board of Supervisors, 21 F.3d 1319 (4th Cir. 1994) (en banc) (local zoning decision); Palumbo v. Waste Technologies Industries, 989 F.2d 156 (4th Cir. 1993) (grant of permit by Ohio Environmental Protection Agency for hazardous waste incinerator); Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, 945 F.2d 760 (4th Cir. 1991) (local zoning decision); Brandenburg v. Seidel, 859 F.2d 1179 (4th Cir. 1988) (liquidation of failed savings and loan by state-appointed receiver and decisions of state receivership court); Meredith v. Talbot County, 828 F.2d 228 (4th Cir. 1987) (local zoning decision); Browning-Ferris v. Baltimore County, 774 F.2d 77 (4th Cir. 1985) (same); Caleb Stowe Assocs. v. County of Albemarle, 724 F.2d 1079 (4th Cir. 1984) (same). See also Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996) (discussing applicability of Burford to suit by state insurance commissioner).

Here, by contrast, the district court was asked to decide a set of relatively straightforward state law questions: What is the meaning of the gaming statute's $125 payout limit? Would violation of that limit constitute a "special inducement" or an unfair trade practice? There is no state administrative agency or specialized court charged with making these determinations--nor do these determinations raise issues that would seem to require administrative expertise. Rather, these are the sort of questions that judges routinely face, and at least one of them, according to the South Carolina Supreme Court, was not even particularly difficult. In Gentry v. Yonce , that court held that the $125 payout limit "states exactly what it means." 522 S.E.2d 137, 143 (S.C. 1999) ("We will reject a meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the Legislature or would defeat the plain legislative intention."). South Carolina's highest court went on to note that the district court here had analyzed the payout limit, and the possibility that a violation of the limit might serve as a predicate for a RICO violation, in a manner "consistent" with its own opinion. See id. at 143 n.18.

The panel evidently does not think that a federal district court should broach these questions, but its rationale for refusing to exercise jurisdiction has nothing to do with whether the state of South Carolina has empowered certain administrative agencies to inspect and license video poker machines. Rather, the abstention principle

10

implicit in the panel's opinion would seem to apply <u>regardless</u> of the enforcement mechanism chosen by a state, even in the complete absence of an administrative scheme. The abstention doctrine applied by the panel directs that: a federal court should abstain from decision whenever a case 1) largely turns on state law issues, and 2) involves a matter of traditional state concern, particularly when 3) it implicates an issue of controversy in the state.

Even if established precedent recognized such an abstention principle, which it does not, that principle well might not apply in this case. Arguably, at least, plaintiffs' RICO claim was at the core, and not the periphery, of their case against the video poker operators. The panel majority's characterization of the RICO claim as a "Trojan horse" to get into federal court certainly seems unfair, in view of the fact that plaintiffs were content to litigate it in state court. Furthermore, it is not at all clear that gambling is an issue as quintessentially "local" as the panel claims. The panel's assumption about the local nature of gambling sits in tension with RICO itself, in which Congress, grappling with a set of problems it believed to be national in scope, specifically referred to gambling in defining "racketeering activity." <u>See</u> 18 U.S.C. § 1961(1)(A)(1994 & Supp. IV 1998).

In evaluating the merits of the panel's preference for state court adjudication, I need not go much beyond the principle's novelty. As the concurring opinion correctly noted, we are an inferior federal court; "we derive our very existence from the Congress, and we accept our jurisdiction largely from that Branch." It seems to me that, as such, we are a far-from-ideal vehicle for the enunciation of a new prudential exception to the jurisdiction that Congress has given us.

The abstention doctrines are derived, not from Article III or from the jurisdictional statutes, but rather from the "sound equitable discretion" of the federal courts. <u>See Burford</u>, 315 U.S. at 318. The panel opinion warns that the abuse of equity power may "thwart the expression of the democratic will." At the same time, the panel deploys its own equitable powers to diminish the force of democratic enactments at both the federal and state levels. It fashions an exception to the Congressional grant of jurisdiction and, in doing so, impedes the enforcement of RICO and of South Carolina's gaming and unfair

11

trade practices laws--all themselves unmistakeable expressions of the democratic will.

It is not clear to me where the limits of the panel's new abstention principle lie. By overstating the applicability of <u>Burford</u> here, the panel obscures the doctrinal boundaries of the abstention principle implicit in its opinion. I am not certain how far the panel's preference for state court adjudication goes, and I am most concerned that, because of this lack of clarity, the panel's abstention principle will be applied in ways that we cannot anticipate.

At the very least, <u>en banc</u> review would have enabled us to focus more attention on what some of these unanticipated applications might be, and to sharpen the doctrinal boundaries of the principle itself. I myself doubt the wisdom of this contraction of federal court jurisdiction, and I question whether such a potentially sweeping change properly originates in our chambers. With all respect to my good colleagues, I dissent.

Judge King has authorized me to indicate that he joins in this dissent.