**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES ALLEN HARPER, a resident and
citizen of Ohio previously doing
business as Southern Ohio Disposal;
SOUTHERN OHIO DISPOSAL LLC, an
Ohio limited liability company,
                    *Plaintiffs-Appellants,*

v.

PUBLIC SERVICE COMMISSION OF WEST
VIRGINIA; EDWARD H. STAATS, in his
official capacity as Chairman of the
Public Service Commission of West
Virginia; R. MICHAEL SHAW, in his
official capacity as Commissioner
of the Public Service Commission
of West Virginia; MARTHA Y.
WALKER, in her official capacity as
Commissioner of the Public Service
Commission of West Virginia,
                    *Defendants-Appellees,*

STEWART'S SANITATION; SUNRISE
SANITATION SERVICES, INCORPORATED;
TYGARTS VALLEY SANITATION,
INCORPORATED; UNITED DISPOSAL
SERVICES, INCORPORATED; WEST
VIRGINIA ASSOCIATION OF SOLID
WASTE HAULERS AND RECYCLERS;
BFI WASTE SYSTEMS OF NORTH
AMERICA, INCORPORATED,
    *Intervenors/Defendants-Appellees,*

No. 04-1444

and

JAMES D. WILLIAMS, in his official
capacity as Chairman of the Public
Service Commission of West
Virginia; CHARLOTTE R. LANE, in her
official capacity as Commissioner
of the Public Service Commission
of West Virginia,
                              *Defendants.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Mary E. Stanley, Magistrate Judge.
(CA-03-516-2)

Argued: October 28, 2004

Decided: January 24, 2005

Before WILKINSON and WILLIAMS, Circuit Judges,
and Glen E. CONRAD, United States District Judge
for the Western District of Virginia,
sitting by designation.

Reversed and remanded by published opinion. Judge Wilkinson wrote
the opinion, in which Judge Williams and Judge Conrad joined.

**COUNSEL**

**ARGUED:** John Philip Melick, JACKSON KELLY, P.L.L.C.,
Charleston, West Virginia, for Appellants. Webster J. Arceneaux, III,
LEWIS, GLASSER, CASEY & ROLLINS, P.L.L.C., Charleston,
West Virginia, for Appellees. **ON BRIEF:** Brian C. Helmick, JACK-

SON KELLY, P.L.L.C., Charleston, West Virginia, for Appellants. Martin J. Glasser, LEWIS, GLASSER, CASEY & ROLLINS, P.L.L.C., Charleston, West Virginia; Leonard B. Knee, Eric Calvert, BOWLES, RICE, MCDAVID, GRAFF & LOVE, P.L.L.C., Charleston, West Virginia; Richard E. Hitt, Franklin G. Crabtree, PUBLIC SERVICE COMMISSION, Charleston, West Virginia; Samuel F. Hanna, Charleston, West Virginia, for Appellees.

---

## OPINION

WILKINSON, Circuit Judge:

In this case we consider the effect of the commerce power on a federal court's discretion to abstain under *Younger v. Harris*, 401 U.S. 37 (1971). Southern Ohio Disposal LLC ("SOD"), an Ohio-based solid waste disposal service, contracted with customers in West Virginia to collect their garbage and dispose of it in Ohio. The Public Service Commission of West Virginia ("PSC") barred SOD from competing with waste removers whom the PSC effectively had licensed with an exclusive franchise. After the agency ruling, SOD brought suit in federal district court to enjoin the PSC from enforcing its order. SOD argued that the PSC order violated the Commerce Clause. The district court abstained under *Younger*.

We reverse. The values of comity and federalism protected by *Younger* are undeniably important. But the state interests at stake here do not fall among those the federal courts have repeatedly recognized as deserving of special respect and solicitude. Moreover, the federal interest asserted under the commerce power lies at the core of the commercial values protected by that clause, namely the promotion of robust trade and enterprise among the several states. This interest has been reaffirmed in this specific context by a panel of this court. *See Medigen of Ky., Inc. v. Pub. Serv. Comm'n*, 985 F.2d 164 (4th Cir. 1993). We hold that the district court erred in abstaining from ruling on the significant Commerce Clause challenge raised in SOD's complaint, and we remand the case for a determination on the merits.

I.

Southern Ohio Disposal, an Ohio company owned by James Harper, removes solid waste from its customers in West Virginia. SOD's

base is in Pomeroy, Ohio; trucks start there and, after collecting the refuse, return to Ohio to dispose of it.

West Virginia requires common carriers engaged in businesses like SOD's to obtain a "certificate of convenience and necessity" from the PSC. W. Va. Code Ann. § 24A-2-5(a) (Michie 2004). Without the certificate, it is "unlawful for any contract carrier by motor vehicle to operate" in West Virginia. *Id.* § 24A-3-3(a). But obtaining the certificate requires demonstrating that those who already are certified to provide service for a given geographic area are not "adequately serving the same territory." *Id.* In the absence of such a showing, the PSC "shall not grant such certificate" to any applicant. *Id.* § 24A-2-5(a).

It is undisputed by SOD's competitors that this arrangement gives those pre-existing waste haulers a monopoly over a given geographic area. And indeed West Virginia law states that one purpose of the regulation of common carriers is "prevent[ing] unnecessary multiplication of service" among them. *Id.* § 24A-2-3. This regulatory system applies to in-state competitors, but more importantly here, SOD — an out-of-state competitor — alleges that it erects barriers to interstate trade in solid waste hauling. It is this interstate effect that makes relevant the Commerce Clause.

SOD had no certificate and was therefore not in compliance with state law and PSC regulations.[1] One of SOD's competitors filed a complaint with the PSC against the Town of Mason, West Virginia, because the town had contracted with SOD. The competitor had been awarded the franchise for that area by the PSC. SOD was subsequently added to the complaint as a necessary party. SOD attempted to remove to federal court, but the district court found that under 28 U.S.C. § 1441(a) (2000), the PSC was not a state court and removal was therefore unavailable.

---

[1]SOD's complaint alleged that it had made inquiries with PSC personnel before entering the West Virginia market and was told that no license or certificate was needed from the PSC "so long as [its] vehicles had apportioned tags, fuel stickers, and other requirements imposed on interstate motor carriers." Because of the present posture of this case, however, we do not consider merits questions or defenses that have no bearing on the decision to abstain.

Initial proceedings before the Chief Administrative Law Judge for the PSC favored SOD. The ALJ found that the PSC's requirements violated the Commerce Clause. She recognized that the PSC had unsuccessfully defended very similar regulations in *Medigen of Kentucky, Inc. v. Public Service Commission*, 985 F.2d 164 (4th Cir. 1993). Those regulations governed interstate transportation of *medical* waste; this court found them to violate the dormant Commerce Clause, even under the most deferential test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Medigen* concluded that the PSC had "restrict[ed] market entry" and in so doing had wrongfully limited the available service from which customers could choose, including interstate carriers. The court held that "West Virginia's goal of providing universal service at reasonable rates may well be a legitimate state purpose, but restricting market entry does not serve that purpose." *Medigen*, 985 F.2d at 167. Finding that *Medigen* foreclosed the similar regulations that impeded interstate transportation of *solid* waste, and concluding that none of the distinctions of *Medigen* urged by SOD's competitor were meaningful, the ALJ recommended that the complaint be dismissed.

The PSC, however, rejected this recommendation. It instead ordered SOD to "cease and desist from collecting solid waste in West Virginia until [it] first obtains a certificate" from the PSC. Although West Virginia law permitted filing a petition with the Supreme Court of Appeals within 30 days of the adverse decision, W. Va. Code Ann. §§ 24-5-1; 24A-8-1 (Michie 2004), SOD declined to do so. As the parties acknowledge, review by that court is discretionary.

Instead, SOD brought suit against the PSC in the U.S. District Court for the Southern District of West Virginia. A large group of other waste haulers — who had also intervened in the PSC proceedings — intervened as defendants. The magistrate judge found federal jurisdiction, but concluded that both *Younger* and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), justified abstention. *Harper v. Pub. Serv. Comm'n*, 291 F. Supp. 2d 443 (S.D. W. Va. 2003).

SOD appealed the abstention order to this court. We review decisions to abstain under an abuse of discretion standard. *Nivens v. Gilchrist*, 319 F.3d 151, 153 (4th Cir. 2003). In the interim, SOD asked us to enjoin PSC enforcement of the cease-and-desist order. We

granted the injunction on July 28, 2004, and now reverse the district court's decision to abstain.

## II.

*Younger* abstention originated as a doctrine requiring federal courts not to interfere with ongoing state criminal proceedings. *See Younger*, 401 U.S. at 46. The Supreme Court has since made clear, however, that it applies as well "to noncriminal judicial proceedings when important state interests are involved." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Criminal proceedings are, perhaps, the most obvious example of the states' sovereign authority "to perform their separate functions in their separate ways." *Younger*, 401 U.S. at 44. But other state functions also lie at the heart of the states' identity under the Constitution. In *Middlesex County*, the Court listed three questions which must be answered in the affirmative for a case to merit abstention under *Younger*:

> *first*, do [the state proceedings] constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges.

*Middlesex County*, 457 U.S. at 432 (emphasis in original).

The parties do not dispute the third prong, and we accordingly assume that the PSC has shown that it provided an adequate opportunity to raise constitutional challenges. SOD and the PSC do disagree as to whether the PSC's order, and the availability of discretionary review by the Supreme Court of Appeals, constitute "ongoing judicial proceedings." We need not resolve this question, however, because we think that this case turns fundamentally on the second requirement — whether the PSC's decision implicates important state interests. We therefore turn to that question.

## A.

Assuming the other requirements are met, "if the State's interests in the proceeding are so important that exercise of the federal judicial

power would disregard the comity between the States and the National Government," *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 11 (1987), abstention is proper. The list of areas in which federal judicial interference would "disregard the comity" that Our Federalism requires is lengthy. It encompasses those interests that the Constitution and our traditions assign primarily to the states. Functions which make our states self-governing sovereigns, rather than "mere political subdivisions" or "regional offices" of the federal government, *New York v. United States*, 505 U.S. 144, 188 (1992), are inherently "important state interests" that may warrant *Younger* abstention.

Many interests beyond criminal law, *see Younger*, 401 U.S. at 43-46, are core sources of state authority. For instance, enforcing state court judgments cuts to the state's ability to operate its own judicial system, a vital interest for *Younger* purposes. *See, e.g.*, *Pennzoil*, 481 U.S. at 12-13.

States have always held primary sway over education; likewise, its close cousin "[f]amily relations [is] a traditional area of state concern." *Moore v. Sims*, 442 U.S. 415, 435 (1979) (requiring *Younger* abstention in case involving custody of allegedly abused children). *See also 31 Foster Children v. Bush*, 329 F.3d 1255, 1275 (11th Cir. 2003) (state foster care system); *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1268 (10th Cir. 2002) (access to adoption); *Morrow v. Winslow*, 94 F.3d 1386, 1397 (10th Cir. 1996) (adoption proceedings); *Liedel v. Juvenile Court*, 891 F.2d 1542, 1546 (11th Cir. 1990) (child abuse proceedings).

Similarly, property law concerns, such as land use and zoning questions, are frequently "important" state interests justifying *Younger* abstention. *See, e.g.*, *Carroll v. City of Mt. Clemens*, 139 F.3d 1072, 1075 (6th Cir. 1998) (state and local housing code enforcement); *Duty Free Shop, Inc. v. Administracion de Terrenos de Puerto Rico*, 889 F.2d 1181, 1182 (1st Cir. 1989) (eminent domain); *World Famous Drinking Emporium, Inc. v. City of Tempe*, 820 F.2d 1079, 1083 (9th Cir. 1987) (nuisance ordinance "in aid of and closely related to Tempe's zoning ordinance"). Further, the law of probate, trusts, and estates — allocating the personal property of citizens — remains an important interest of the states for *Younger* purposes. *See,*

*e.g.*, *Williams v. Adkinson*, 792 F. Supp. 755, 766 (M.D. Ala. 1992) (distribution of decedent's property).

Matters relating to public health are not infrequently under the purview of the states, and may justify abstaining under *Younger*. *See, e.g.*, *Brach's Meat Mkt., Inc. v. Abrams*, 668 F. Supp. 275 (S.D.N.Y. 1987) (state regulation of kosher meat sales). Similarly, the regulation and licensing of health care professionals may be an important interest under the states' residual police powers and bear on the abstention decision. *See, e.g.*, *Green v. Benden*, 281 F.3d 661, 666 (7th Cir. 2002) (suspension of psychologist's state license); *Majors v. Engelbrecht*, 149 F.3d 709, 713 (7th Cir. 1998) (suspension of nurse's license); *Watts v. Burkhart*, 854 F.2d 839, 846 (6th Cir. 1988) (suspension of medical license).

Corporate law, too, often reveals state interests important in *Younger* analysis. Charitable trusts and corporations, like other corporations, have traditionally been creatures of the states. *See, e.g.*, *Worldwide Church of God, Inc. v. California*, 623 F.2d 613, 616 (9th Cir. 1980) (investigating fraud in charitable trusts). In addition, certain businesses have historically been subject to the oversight of state government, a factor which bears on abstention decisions. *See, e.g.*, *Alleghany Corp. v. McCartney*, 896 F.2d 1138, 1144 (8th Cir. 1990) (domestic insurance companies implicate state's "substantial, legitimate" regulatory interest); *Johnson v. Collins Entm't. Co., Inc.*, 199 F.3d 710, 720 (4th Cir. 1999) (gambling is "an area where state authority has long been preeminent").

## B.

Federal courts thus do not hesitate to recognize as "important" under *Younger* those state interests which reflect the inalienable attributes of sovereignty retained by American states. We intend no detraction from this critical principle of federalism when we note that the Supreme Court's requirement that the state interest be "important" precludes some candidates from admission.

Over and again, the Court has repeated this requirement of importance. "We have applied the *Younger* principle to civil proceedings in which *important* state interests are involved. We have also applied it

to state administrative proceedings in which *important* state interests are vindicated . . . ." *Ohio Civil Rights Comm'n v. Dayton Christian Sch.*, 477 U.S. 619, 627 (1986) (internal citations omitted) (emphasis added). The Court's clear insistence that the interests be "important" requires us to recognize some limits.

One limit comes naturally, upon proper characterization of the state interest. Were we to permit a lofty level of generality as to how we identify the interests at stake, we would find that nearly anything could at least touch on something like the "general welfare," "the public good," or "public safety." This would render a nullity the requirement that we ensure that the state interest be important. The more difficult it is to specify the nature of the state proceedings with clarity, persuasiveness, and without attenuation, the less likely the proffered interest belongs in the zone of important state interests.

Neither may we grind the state interest too finely, however,

> because when we inquire into the substantiality of the State's interest in its proceedings, we do not look narrowly to its interest in the *outcome* of the particular case . . . . Rather, what we look to is the importance of the generic proceedings to the State. . . . [I]n [*Dayton Christian Schools*], we looked not to Ohio's specific concern with Dayton Christian Schools' firing of Linda Hoskinson, but to its more general interest in preventing employers from engaging in sex discrimination. . . . [T]he appropriate question here is not whether Louisiana has a substantial, legitimate interest in reducing NOPSI's retail rate below that necessary to recover its wholesale costs, but whether it has a substantial, legitimate interest in regulating intrastate retail rates.

*NOPSI*, 491 U.S. at 365 (internal citations omitted) (emphasis in original). In short, the characterization of state interests should not be general to the point of rendering the *Middlesex County* test meaningless, or specific to the point of rendering the state interest trivial.

A second aid in testing the significance of state interests comes from recognizing that the "central idea [in abstention analysis] has

always been one of simple comity." *Johnson*, 199 F.3d at 719. This is true of abstention generally, but it has particularly been the touchstone of *Younger* abstention. Since *Younger* itself, it has been understood that the interests of both the national and state governments are advanced when federal courts abstain from interfering with the kind of ongoing state proceedings which, simply stated, make a state a state. In a word, this itself is comity. *See Younger*, 401 U.S. at 44. This principle represents the structural nature of our Constitution, which — through federalism — has reserved many functions to the states even as it has allocated others, for the benefit of all states, to the national government.

For this reason of comity, we hold fast to the notion that when an interest central to a case implicates the sovereignty and dignity of a state, and when the other requirements set forth in *Middlesex County* are met, federal courts should abstain. Interests like education, land use law, family law, and criminal law lie at the heart of state sovereignty, and a failure to abstain in the face of ongoing state proceedings would disrespect the allocation of authority laid in place by the Framers. In other words, that which must be respected through "comity" is identical to the traditional "areas of paramount state concern," *Johnson*, 199 F.3d at 719, and also the same as the "important state interests" test of *Middlesex County*, 457 U.S. at 432. When a state interest does not fit one of these characterizations, it will likely fail to satisfy any other, for they all are shorthand for the structural values of "Our Federalism" that Justice Black described. *Younger*, 401 U.S. at 44.

Using this framework, we next evaluate the interests advanced by the PSC in this case.

III.

A.

The district court, agreeing with the PSC, concluded that the PSC proceedings implicated the important state "interest in protecting the health and welfare of its citizens." 291 F. Supp. 2d at 458. This interest was advanced by "preventing pollution and illness caused by the improper disposal of solid waste . . . ." *Id.*

At first glance, this may seem to fit within the range of state inter-ests that meet the standards for *Younger* abstention. But, as explained above, any interest can at least tangentially relate to health and wel-fare. The problem with this characterization is that the PSC require-ment challenged here does not concern "improper disposal of solid waste." It concerns who has the right to contract with towns, busi-nesses, and individuals in West Virginia to remove that waste, *not* the manner in which that waste is removed. Thus, the state interest at stake here is its interest in limiting interstate access to the waste removal market. While neutral health, safety, and environmental reg-ulations are one thing, limitation on market access to maintain exclu-sive franchises for existing enterprises is another. The possibility that erecting barriers to entry may have certain positive derivative effects — effects the district court called "conceivable," *id.* — is an appropri-ate argument for a merits consideration, but is too remote to be the important state interest that is vindicated.

B.

Because the interest advanced here is one that *by its very nature* serves to impede interstate commerce, we must evaluate the effect of the dormant Commerce Clause upon the decision to abstain. Although we do not reach the merits of the underlying claim, we conclude that the interest West Virginia advances through the state action SOD challenges is insufficient to warrant abstention.

It is true, as the PSC asserts, that "the mere assertion of a substan-tial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction." *NOPSI*, 491 U.S. at 365. Constitu-tional questions — commonly involved in *Younger* abstention cases — generally can be resolved by state courts. *Younger* itself involved such a question; much of its progeny did as well.[2] We have previously

---

[2]For but a few examples, see, e.g., *Moore v. Sims*, 442 U.S. 415 (1979) (applying *Younger* to constitutional challenge to state law allowing removal of suspected victims of child abuse); *Trainor v. Hernandez*, 431 U.S. 434 (1977) (applying *Younger* to constitutional challenge to state attachment statute); *Hicks v. Miranda*, 422 U.S. 332 (1975) (applying *Younger* to a First Amendment challenge to a state obscenity statute); *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (applying *Younger* to a First Amendment challenge to closing a movie theater for showing alleg-edly obscene movies).

affirmed that *Younger* abstention is premised upon the idea that "state courts are fully competent to decide issues of federal law . . . ." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 251 (4th Cir. 1993). Indeed, the Supremacy Clause, *see* U.S. Const. art. VI, requires as much. *See Testa v. Katt*, 330 U.S. 386 (1947) (holding that Article VI generally requires state courts to enforce federal law). But while most of the areas of important state interests noted above — criminal law, insurance law, family law, zoning law, and the like — may from time to time implicate various constitutional provisions, there is no disrespect to federal-state relations in allowing state courts to address those constitutional questions. This is because many constitutional provisions assign rights and responsibilities but do not themselves create any particular interests for states against their sister states, or vis-a-vis the national government.

The commerce power plays a role in abstention analysis quite different from many of the other provisions of the Constitution. The dormant Commerce Clause demonstrates a difference of kind, not merely of degree. By its very nature, it implicates interstate interests. It protects all states by ensuring that no state erects the kind of barriers to trade and economic activity that threatened the survival of a fledgling country under the Articles of Confederation. Recognizing that there is a peculiarly national interest — and therefore, more limited state interest — in no way threatens the kind of comity that has always underpinned the *Younger* doctrine. No state's dignity could be offended by acknowledging the obvious point that the Framers consciously withdrew interstate commerce from the vast collection of interests that remain the primary responsibility of the states.

Giving the power over commerce to Congress was easily seen as structurally creating an interstate interest. Indeed, even when Congress has not acted, the Supreme Court has long recognized that the Commerce Clause nonetheless divests states of any interest which unduly burdens interstate commerce. "[S]ubjects of [the commerce] power [that] are in their nature national," *Cooley v. Bd. of Wardens*, 53 U.S. (12 How.) 299, 319 (1851), are appropriate for congressional — but generally not state — regulation. This jurisprudence embodies "the principle of the unitary national market." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994). Our "national common market," *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333,

350 (1977) (internal quotes omitted), does not allow states — even inadvertently — to impede commerce and sow disunity. We have recognized that "[a] state cannot achieve a legitimate economic goal through 'the illegitimate means of isolating the State from the national economy.'" *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 786 (4th Cir. 1996) (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 456-57 (1992)). "[T]he Commerce Clause prohibits states from balkanizing into separate economic units." *Envtl. Tech. Council*, 98 F.3d at 786.

When there is an overwhelming federal interest — an interest that is as much a core attribute of the national government as the list of important state interests are attributes of state sovereignty in our constitutional tradition — no state interest, for abstention purposes, can be nearly as strong at the same time. *See Transouth Fin. Corp. v. Bell*, 149 F.3d 1292, 1296 n.1 (11th Cir. 1998). "[T]he notion of comity, so central to the abstention doctrine, 'is not strained when a federal court cuts off state proceedings that entrench upon the federal domain.'" *Zahl v. Harper*, 282 F.3d 204, 210 (3d Cir. 2002) (quoting *Ford Motor Co. v. Ins. Comm'r*, 874 F.2d 926, 934 (3d Cir. 1989)).

Acknowledging interstate interests in the abstention context is not new. *NOPSI* specifically noted that the interest at stake there was in "intrastate" rate setting. *NOPSI*, 491 U.S. at 365. Similarly, in *Federal Express Corp. v. Tennessee Public Service Commission*, 925 F.2d 962 (6th Cir. 1991), the Sixth Circuit affirmed a decision to abstain in light of a Commerce Clause preemption argument because "Tennessee has an important interest in regulating *intrastate* trucking." *Id.* at 969 (emphasis added). The court recognized the need to highlight the *intrastate* interest, which contrasts dramatically — for Commerce Clause purposes, at least — with the PSC's alleged burden on *interstate* commerce.

And significantly for present purposes, we cannot understand why we should countenance abstention in this case, under any of the abstention doctrines, when the same comparative federal and state interests were present in *Medigen*. The district court in that case rejected abstention, *see Medigen of Ky. v. Pub. Serv. Comm'n*, 787 F.

Supp. 590, 594 (S.D. W. Va. 1991), and in *Medigen* we affirmed Judge Copenhaver's judgment on the merits.[3]

## IV.

In short, the commerce power itself justifies a narrower view of state interests in the abstention context. In addition to squarely implicating the Commerce Clause, West Virginia's interest, in light of our decision in *Medigen*, could not be sufficiently strong to require abstention. We there made clear that state action "restricting market entry," *Medigen*, 985 F.2d at 167 — the interest at stake here — was suspect. Although *Medigen* was not primarily an abstention case, its balancing of state interests similar to those raised here should have put the parties on notice of the *Younger* analysis that we have detailed above. A prior court of appeals decision is, of course, not a prerequisite to rejecting a request for abstention when no important state interest appears. But it certainly adds a significant weight to the balance.

Although a state interest that on its face implicates the Commerce Clause is seldom an important state interest for *Younger* purposes, this does not mean that state interests are irrelevant to Commerce

---

[3]Our conclusion that *Younger* respects the structural ramifications of the Constitution is not new. Our sister circuits have recognized, for instance, that the Indian Commerce Clause — part of the *same constitutional provision* creating the national interest in interstate commerce — creates a similarly weighty national interest in regulating Indian affairs. *See* U.S. Const. art. I, § 8, cl. 3. Consequently, the state interest for *Younger* purposes in such cases is often not "important," even though the states may well have legitimate interests in some parts of the underlying case. *See, e.g.*, *Seneca-Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709, 713 (10th Cir. 1989) (finding unimportant for *Younger* purposes the state's interest in regulating tribal bingo games since the federal interest is "paramount in the conduct of Indian affairs in Indian Country"). *See also id.* at 714 (since "federal interests predominate, the State's interest in the litigation is . . . not important enough to warrant *Younger* abstention"). *Seneca-Cayuga* has led to the same conclusion in other contexts. *See, e.g.*, *Winnebago Tribe v. Stovall*, 341 F.3d 1202, 1204-05 (10th Cir. 2003); *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 541 (9th Cir. 1995); *Ft. Belknap Indian Cmty. v. Mazurek*, 43 F.3d 428, 431-32 (9th Cir. 1994).

Clause analysis. They matter greatly, and are factored into the merits determination. Depending on the nature of the state action, dormant Commerce Clause analysis balances the state interests against the impediment to interstate commerce. *See, e.g.*, *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (balancing legitimate local purposes against the availability of alternative means of serving them).

In *Medigen*, we conducted this balancing using the more deferential standard of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Under *Pike*, "the regulation is upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Medigen*, 985 F.2d at 166 (internal quotation omitted). We declined to consider the stricter tests because the PSC regulation was "unconstitutional even under the [most] deferential balancing test" laid out in *Pike*. *Id.*

We have used *Medigen* as support for our conclusion on the abstention issue, but we have had neither briefing nor argument on the merits, and decline to reach them here. While we therefore leave to the district court on remand the merits determination, we commend to the parties the undisputed relevance of the *Medigen* decision to the underlying Commerce Clause question.

V.

The district court also found that *Burford* abstention was applicable to this case, and we review that decision for an abuse of discretion as well. *First Penn-Pacific Life Ins. Co. v. Evans*, 304 F.3d 345, 348 (4th Cir. 2002). Applying *Burford* here was inappropriate. That doctrine requires abstention in "cases (1) that present 'difficult questions of state law . . .' or (2) whose adjudication in a federal forum 'would be disruptive of state efforts to establish a coherent policy'" in important areas of public concern. *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 719 (4th Cir. 1999) (quoting *NOPSI*, 491 U.S. at 361). *Johnson* repeatedly noted that "[i]ssues of state law and state public policy have dominated this action from day one." *Id.* at 720.

The present case, however, involves a vital *federal* question — whether the West Virginia requirements unconstitutionally burden interstate commerce. It does not require the district court to pass on

any "difficult questions of state law." Nor would federal jurisdiction impede the formation of core state policies. We must also reverse the district court's decision to abstain under *Burford*.

The judgment is therefore reversed and the case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*